322 So.2d 533 (1975)
Gary Eldon ALVORD, Appellant,
v.
STATE of Florida, Appellee.
No. 45542.
Supreme Court of Florida.
September 17, 1975.
Rehearing Denied December 15, 1975.
*535 James A. Gardner, Public Defender, and Richard W. Seymour, Asst. Public Defender, for appellant.
Robert L. Shevin, Atty. Gen., and Andrew W. Lindsey, Asst. Atty. Gen., for appellee.
ADKINS, Chief Justice.
This is a direct appeal from a judgment adjudging defendant guilty of murder in the first degree and a sentence of death.
An indictment, containing three counts of murder in the first degree, charged that, on June 17, 1973, the appellant (hereinafter referred to as defendant) murdered Georgia Tully (hereinafter referred to as Georgia), Ann Herrman (hereinafter referred to as Ann), and Lynn Herrmann (hereinafter referred to as Lynn). The defendant was alleged to have committed each of the murders by strangling the named victim to death by means unknown to the Grand Jury.
In the early afternoon of June 18, 1973, the bodies of Georgia, Ann and Lynn were discovered in a home in Tampa, Florida. The home was owned by Ann, who was the daughter of Georgia. Lynn, eighteen years of age, was the daughter of Ann and lived at home with her mother.
Each of the three women was found in a separate room in the house and each had been strangled with a piece of cord. A vaginal test on Lynn showed the presence of semen and there was a slight abrasion on the right side of her head. The front door of the house had been kicked open and the condition of the house tended to indicate that the murderer burglarized the house either before or after the three women had been murdered. The time of death was tentatively established as occurring between 11:00 a.m., Saturday, June 16, 1973, and 1:30 p.m., Monday, June 18, 1973.
At the trial the jury returned a verdict finding the defendant "guilty as charged in the indictment." After the trial of the penalty phase, the jury recommended to the court that it impose the death penalty upon defendant under each count of the indictment. The trial judge then imposed the death sentence in conformity with the recommendation of the jury and filed an order setting out his finding of facts in support thereof. Upon denial of the motion for new trial, defendant filed a timely notice of appeal.
Defendant first makes a three-pronged attack upon the constitutionality of Fla. Stat. §§ 775.082, 782.04 and 921.141, F.S.A., saying that
(a) The present capital sentencing procedures are unconstitutionally discretionary;
(b) The statutory distinction between first and second degree felony murder is unconstitutionally vague;
(c) The death sentence is per se cruel and unusual.
He requests that we reconsider State v. Dixon, 283 So.2d 1 (Fla. 1973). Once again we hold the statutes to be constitutional *536 and reaffirm State v. Dixon, supra. See Sullivan v. State, 303 So.2d 632 (Fla. 1974) and Alford v. State, 307 So.2d 433 (Fla. 1975).
Defendant contends that the provisions of the Florida Statute allowing a jury to render an advisory opinion on the question of the sentence to be imposed in a capital case by a simple majority vote violates the defendant's right to a trial by jury guaranteed by the Florida and United States Constitution. The defendant recognizes that Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152, upheld a statute which allowed a conviction to be entered in certain felony cases upon a nine-three plurality verdict of the jury, but says that the court based its decision upon the fact that the Louisiana statute required the concurrence of a "substantial majority" of the jurors. The contention advanced by defendant in the case sub judice was rejected by the United States Supreme Court in the Johnson case when the Court said:
"We note at the outset that this Court has never held jury unanimity to be a requisite of due process of law. Indeed, the Court has more than once expressly said that `[i]n criminal cases due process of law is not denied by a state law ... which dispenses with the necessity of a jury of twelve, or unanimity in the verdict.' Jordan v. Massachusetts, 225 U.S. 167, 176, 32 S.Ct. 651, 56 L.Ed. 1038, 1042 (1912) (dictum). Accord, Maxwell v. Dow, 176 U.S. 581, 602, 605, 20 S.Ct. 448, 44 L.Ed. 597, 605, 606 (1900) (dictum)." 406 U.S. at 359, 92 S.Ct. at 1623, 32 L.Ed.2d at 157, 158.
The argument of defendant on unanimous v. majority recommendations was specifically met by this Court in Watson v. State, 190 So.2d 161 (Fla. 1967), when it stated:
"The provisions of F.S. Sections 794.01 and 919.23, F.S.A., authorizing a jury by a majority vote to recommend mercy for a defendant it has found guilty in a capital case are beneficial to the defendant. Requirement of a unanimous vote would lessen defendant's chance for mercy. Without these provisions said statutes would result in a defendant found guilty thereunder being automatically sentenced to death. It lies within the province of the Legislature to prescribe the punishment to be imposed upon a person who is found guilty or pleads guilty to an offense as well as the method or manner of its imposition. The power to define what acts shall constitute criminal offenses and what penalties shall be inflicted on offenders is legislative. 14 Am.Jur., Criminal Law, § 16. The legislature may authorize a jury to assess punishment. 15 Am.Jur., Criminal Law, § 510. It is not necessary in the sentencing phase of a criminal case that the jury's verdict be unanimous where the legislature provides otherwise. The cases cited by the Appellants from other jurisdictions do not construe statutes similar to F.S. Sections 794.01 and 919.23, F.S.A., which require only a majority vote for a recommendation of mercy. There is no provision in our Constitution requiring a unanimous verdict in respect to a recommendation of mercy." (pp. 166, 167)
The State, as part of its direct case, called Detective Donald Dufour, of the Lansing Police Department, who had arrested the defendant in Lansing, Michigan, about three weeks after the murders. Dufour originally arrested defendant in connection with a burglary which had occurred in the Lansing area. Dufour took defendant from the jail section of the Police Department to the office of Detective Bureau and gave him the following advice as to his rights:
"A First of all I advised him that, who I was. I advised him who I was and that I was a detective with the Police Department in Lansing. I advised him that he didn't have to talk to me, that anything he said will be used in *537 court against him. I advised him that he had to, he had a right to have an attorney. He had a right to have an attorney present before he answered any questions or made any statement.
"Q All right. Did he request to have an attorney?
"A No, sir, he did not.
"Q Did he request to remain silent?
"A No, sir, he did not.
"Q Did you or anyone in your presence promise him anything in order for him to make a statement?
"A No, sir.
"Q Did you or anyone in your presence threaten him to make a statement?
"A No, sir.
"Q Did you promise him immunity if he made a statement?
"A No, sir.
"Q Did you coerce him in any way to make a statement?
"A No, sir.
"Q Did he indicate whether or not he understood his rights?
"A Yes, sir. He told me he was aware of his rights." (Tr. pp. 689, 690)
When Dufour advised defendant that he wanted to talk to him about a "safe job," the defendant looked at him and said, "I am a rapist, not a God-damn thief." When Dufour asked defendant what was meant by that, the defendant told him he was wanted for three murders in Florida. Dufour then said, "I thought it was two" and defendant replied, "Maybe they forgot one." When Dufour asked, "Did you do it?" defendant responded, "They will have to prove it."
Before permitting Detective Dufour to give this testimony, the trial judge excluded the jury and heard the State's proffer. The trial judge determined that the statement had been made freely and voluntarily and ruled it to be admissible, but cautioned Detective Dufour not to mention to the jury the nature of the offenses he was investigating (the burglary and the safe job). Over objection of defendant, the statement, "I am a rapist, not a God-damn thief" was admitted into evidence.
Defendant says that Dufour failed to advise him that an attorney would be appointed to represent him if he were an indigent. This deficiency in the warning, says defendant, violates the principles set out in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and the resulting statements should have been excluded.
Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), recognizes that the Miranda decision on custodial statements by defendants was not intended to create a constitutional straight-jacket, but rather to provide practical reinforcement for the right against compulsory self-incrimination. In that case, the defendant received all of the Miranda rights with the exception that, if he could not afford counsel, the State would provide him one free of charge. The United States Supreme Court held that the police conduct did not abridge the defendant's constitutional privilege against self-incrimination but only departed from the prophylactic standards enunciated in Miranda. In its opinion the Court said:
"Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever. The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic. Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose.

*538 "* * *
"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least, negligent conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care towards the right of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." Michigan v. Tucker, 94 S.Ct. at 2365.
Defendant's statement that he was a rapist, not a thief, was relevant in view of evidence showing that the underwear of one of the victims was found in a room separate from her body, and her pubic area was exposed. Also, there was evidence of male sperm in her vagina, and testimony that defendant, on the morning after he described the murder to his girl friend, had nail scratches on his chest.
The trial court complied with the United States and Florida constitutional standards pertaining to the admissibility of the custodial statements by defendant.
Contrary to the contention of defendant, the trial judge committed no error in permitting Dr. William G. Gibson to testify that he found sperm from a male when he conducted a vaginal smear on the victim, Lynn.
Defendant complains because the trial judge allowed testimony that defendant owned a gun at the time the murders were committed. Defendant says the evidence was irrelevant as there was no showing that defendant took the gun with him. Defendant's girl friend testified that on the evening after defendant had committed the murder, he stated to her, "I had to rub out three people last night, Zelma," and in response to her question as to whom: "Ann, Lynn and her Mom." Defendant told her he had strangled them after placing them in separate rooms. Defendant told his girl friend that he could not shoot them because it would make too much noise, and that was why he had to strangle them. The trial judge did not commit error in allowing testimony to be given concerning the gun, as great latitude should be allowed in the reception of indirect or circumstantial evidence. See Astrachan v. State, 158 Fla. 457, 28 So.2d 874 (1947). Evidence of the defendant's ownership of a gun was a circumstance lending credence to the testimony of the girl friend.
Defendant contends that error was committed when Dr. Ames Robey was permitted to testify in the penalty phase of the trial that defendant was sane at the time he had committed a rape in the State of Michigan.
Defendant had been charged with the rape of a ten-year-old girl in Michigan and upon trial, a verdict of not guilty by reason of insanity was entered. Dr. Robey examined defendant in connection with the Michigan proceeding in 1969 and 1970. At that time the Doctor saw "evidence of incipient or latent or underlying mental illness" but, in his opinion, defendant understood the charges and was competent to stand trial. Even though defendant was mentally ill "to a minimal degree, he was aware of the wrongfulness of his act at that time."
The test for criminal insanity in Michigan was broader than the test in Florida. Under Michigan law a person was not held responsible for his act if the act was the result of an irresistible impulse due to mental illness.
In the penalty proceedings certain types of evidence which may be inadmissible in a trial on guilt may be admissible and relevant to enable the jury to make an informed recommendation based on the aggravating and mitigating circumstances concerning the acts committed. In fact, *539 one of the statutory mitigating circumstances is the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Fla. Stat. § 921.141(6)(f), F.S.A. There should not be a narrow application or interpretation of the rules of evidence in the penalty hearing, whether in regard to relevance or to any other matter except illegally seized evidence. State v. Dixon, supra. See also Sullivan v. State, 303 So.2d 632 (Fla. 1974), and Smith v. State, 303 So.2d 694 (Fla.App.1st, 1974). This testimony was properly allowed into evidence.
Defendant says that the testimony relative to the Michigan prosecution for rape should have been barred under the doctrine of collateral estoppel as announced in Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). "Collateral estoppel" means that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future law suit. Where a previous judgment of acquittal was based upon a general verdict, the federal rule of collateral estoppel requires the Court to examine the record of the prior proceeding and to conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. The United States Constitution's Fifth Amendment guaranty against double jeopardy protects a man who has been acquitted from having to "run the gauntlet" a second time. A Michigan verdict of "not guilty" would trigger the doctrine of collateral estoppel, so that evidence of the offense would not have been admissible in any phase of the trial.
But the Michigan verdict was "not guilty by reason of insanity." Although any evidence concerning the Michigan case was inadmissible during the trial upon the guilt or innocence of defendant in connection with the Florida offenses, this evidence was admissible in the hearing on the penalty phase after the determination of guilt. The penalty hearing is geared to consider any facts or opinions which may be relevant in determining the statutory mitigating and aggravating circumstances. The Michigan Court determined that defendant either (1) did not have the minimal capacity to distinguish right from wrong, or (2) was suffering from a mental illness which caused an irresistible impulse to commit the act. The doctor who examined the defendant at that time, and again during the Florida trial, was certainly competent to testify as to the mental condition of defendant. This matter was relevant to the question of mitigating or aggravating circumstances during the penalty phase of the proceeding. The latter issue involved in the penalty phase was not determined by any final judgment of the Michigan court, so the doctrine of collateral estoppel is not applicable.
The evidence was sufficient to sustain the verdict of guilt. In addition to the evidence discussed above, there was testimony that defendant had possession of some of Ann's jewelry after the murder; the police found a short piece of rope in a dresser drawer in defendant's apartment which was the same type of rope used to strangle all three of the victims; one of defendant's shirts had blood on it; a witness testified that on the morning after the murder defendant had over $100; one of the victim's purses used to store large quantities of money was found to be empty; defendant told his girl friend he had to kick the door in to get into the house and the evidence showed that this was done.
The evidence corroborated the testimony of the girl friend, Zelma Hurley. She testified that on Saturday night, June 16, 1973, defendant left her about 1:30 a.m. and was gone until 6:30 a.m. When Zelma arose she observed the money in possession of defendant. That night defendant told her, "I had to rub out three people *540 last night," and identified them as Ann, Lynn and Georgia. Defendant then told her the details of the murder.
The jury is charged with the responsibility of resolving factual conflicts. When it is shown that the jurors have performed that duty faithfully and honestly and reached a conclusion that squares with reason, it takes more than a difference in opinion as to what the evidence shows for this Court to reverse them. The conflicts were resolved in favor of the State and the evidence was sufficient as a matter of law to sustain the verdicts. See State v. Smith, 249 So.2d 16 (Fla. 1971).
It is our responsibility to review the sentence in the light of the facts presented in the evidence, as well as other decisions, and determine whether or not the punishment is too great. See State v. Dixon, supra. Three murders were committed while the perpetrator was engaged in the commission of the felony offense of burglary. Each of the murders was especially heinous, atrocious and cruel in that the homicides were committed through strangulation by use of a rope. This could only be accomplished through a cold, calculated design to kill, as distinguished by a single shot from a firearm during an outburst of anger. The great risk of serious bodily harm by death to other persons is apparent, in that defendant obviously murdered two of the victims in order to avoid a surviving witness to the murder of the other victim. The murders were not committed under circumstances which defendant believed to provide a moral justification or extenuation for his conduct and his capacity to conform his conduct to the requirements of law was not impaired. His age, 26 years, had no particular significance. These aggravating circumstances outweigh any circumstances which would mitigate the sentence in this case.
There is no way that the Legislature could program a judicial computer with all of the possible aggravating factors and all of the possible mitigating factors in each case. See State v. Dixon, supra. The law does not require that capital punishment be imposed in every conviction in which a particular state of facts occur. The statute properly allows some discretion, but requires that this discretion be reasonable and controlled. No defendant can be sentenced to capital punishment unless the aggravating factors outweigh the mitigating factors. However, this does not mean that in every instance under a set state of facts the defendant must suffer capital punishment.
The statute contemplates that the trial jury, the trial judge and this Court will exercise reasoned judgment as to what factual situations require the imposition of death and which factual situations can be satisfied by life imprisonment in light of the totality of the circumstances present in the evidence. Certain factual situations may warrant the infliction of capital punishment, but, nevertheless, would not prevent either the trial jury, the trial judge, or this Court from exercising reasoned judgment in reducing the sentence to life imprisonment. Such an exercise of mercy on behalf of the defendant in one case does not prevent the imposition of death by capital punishment in the other case.
Sullivan v. State, supra, involved a death sentence which was held to be appropriate by this Court. During the course of a robbery defendant abducted the victim, struck him with a tire iron, and shot him with both barrels of a shotgun in the back of the head. The defendant reloaded and discharged both barrels again into the victim's head. Just as in Sullivan, this case involves the commission of a burglary and the murder of the victim. The deliberate actions of Sullivan in repeatedly shooting the victim is no less heinous and atrocious than the actions of defendant Alvord in deliberately strangling three women with a rope.
Gardner v. State, 313 So.2d 675 (Fla. 1975), was an appeal from a death sentence *541 for the murder of a female. The murder was accomplished by the use of a blunt instrument, the victim's body containing at least 100 bruises, abrasions and contusions. There was a massive hemorrhage of the pubic area. The victim was beaten so badly that the murder was looked upon as being especially heinous, atrocious and cruel. These aggravating circumstances outweighed any mitigating circumstances and the death penalty was upheld. Certainly, the atrocious manner in which Gardner murdered his victim is no more atrocious or heinous than the atrocious manner in which Alvord coldly strangled three females while committing his burglary.
A female victim was involved in Hallman v. State, 305 So.2d 180 (Fla. 1974). The defendant committed the crime of robbery, cut the victim about the throat and neck with broken glass, slitting her throat and causing her death. Hallman had been convicted of two previous crimes involving an assault upon a young woman with a dangerous weapon. Alvord had been involved with the rape of a young girl in Michigan, and the evidence indicated that an assault was made upon the deceased Lynn, who was 18 years of age. The act of Hallman in cutting the victim with broken glass is no more heinous than the strangulation of three women by Alvord. Comparing the aggravating and mitigating circumstances with those shown in other capital cases and weighing the evidence in the case sub judice, our judgment is that death is the proper sentence.
Pursuant to Rule 6.16(b), Florida Appellate Rules, we have reviewed the evidence to determine whether the interest of justice requires a new trial. No reversible error is made to appear and the evidence does not reveal that the ends of justice require that a new trial be awarded. We find that the judgment and sentence of the trial court in this cause is in accordance with the justice of the cause.
Accordingly, the judgment and sentence of the circuit court are hereby affirmed.
It is so ordered.
ROBERTS and OVERTON, JJ., and AGNER and PATTERSON, Circuit Judges, concur.
ENGLAND, J., concurs in part and dissents in part with an opinion.
ENGLAND, Justice (concurring in part and dissenting in part).
I concur with the majority's decision that defendant had a fair trial and that his conviction for first degree murder was amply warranted by the evidence.[1] I do not agree, however, that any valid death sentence can be imposed under Florida's death sentence statute (Section 921.141, Florida Statutes (1973)).
Under the multiple views expressed in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the selective, arbitrary imposition of the death penalty is prohibited by the Eighth and Fourteenth Amendments to the United States Constitution. I believe our death sentence statute fosters rather than avoids the proscribed unbridled discretion. I share the views of *542 our statute which were expressed by Mr. Justice Ervin and Mr. Justice Boyd in State v. Dixon, 283 So.2d 1, 11, 23 (Fla. 1973) (dissenting). I can now add to their analyses that Florida's experience under the statute proves their perceptions correct.
Since the sentencing statute was enacted, we have reviewed several capital felony cases in which the death sentence could have been imposed.[2] These cases range from love triangle deaths[3] to execution-type slayings.[4] In two decided cases a jury recommended life, the judge imposed a death sentence, and we affirmed his sentence.[5] In four decided cases a jury recommended death, the judge concurred, and we affirmed.[6] In one decided case the defendant entered a guilty plea, no jury recommendation was received (for which deficiency we reversed), and the judge imposed a sentence of death.[7] In another case a jury recommended and the judge sentenced life imprisonment.[8] In still another, a jury recommended, the judge sentenced and we affirmed a death sentence, while an accomplice was allowed a life sentence on the basis of a plea bargain for his testimony.[9]
Perhaps it would be possible to analyze each of these cases, together with those life sentences we have never reviewed, and conclude that Florida's trifurcated sentence procedure[10] exhibits a non-discriminatory pattern consistent with the dictates of Furman. I cannot, however.[11] I believe our statute will produce Furman-prohibited arbitrariness so long as human discretion is injected into one, let alone three, stages of the sentencing process.[12] Until such vagaries are sanctioned by the United States Supreme Court, I cannot reconcile this legislation with the United States Constitution.
I would affirm defendant's conviction, but I would reduce his sentence to life imprisonment.[13]
NOTES
[1] Defendant has challenged the applicable statute on the ground that the statutory distinction between first and second degree murder is unconstitutionally vague. I share Justice Boyd's doubts that any juror of common intelligence, or most judges, can comprehend the distinction. See State v. Dixon, 283 So.2d 1, 26-27 (Fla. 1973) (Boyd, J., dissenting). The statute has recently been held constitutional by a majority of this Court, however, in Dixon and in Alford v. State, 307 So.2d 433 (Fla. 1975). I do not perceive my legal duties to include a refusal to follow fundamental jurisprudential concepts such as stare decisis ("let the decision stand") and judicial restraint. In the absence of intervening events of compelling legal significance, and none are presented with respect to the verbal vagueness between first and second degree murder, the Court should not overturn contemporaneous case law merely because there have been personnel changes in the Court.
[2] Since we do not have jurisdiction to review capital cases resulting in a sentence of life imprisonment (absent some other basis for our jurisdiction), we have no idea how many persons convicted of capital crimes have avoided a judge's sentence of death. Nor do we know what the juries recommended in those cases.
[3] Dorminey v. State, 314 So.2d 134 (Fla., filed Apr. 16, 1975).
[4] Sullivan v. State, 303 So.2d 632 (Fla. 1974); Alford v. State, 307 So.2d 433 (Fla. 1975).
[5] Sawyer v. State, 313 So.2d 680 (Fla., filed Feb. 19, 1975); Gardner v. State, 313 So.2d 675 (Fla., filed Feb. 26, 1975).
[6] Alford v. State, 307 So.2d 433 (Fla. 1975); Hallman v. State, 305 So.2d 180 (Fla. 1975); Spinkellink v. State, 313 So.2d 666 (Fla., filed Feb. 19, 1975); Proffitt v. State, 315 So.2d 461 (Fla., filed May 28, 1975).
[7] Lamadline v. State, 303 So.2d 17 (Fla. 1974).
[8] Dorminey v. State, supra. We affirmed the conviction and sentence in the course of reviewing an independent constitutional question.
[9] Sullivan v. State, 303 So.2d 632 (Fla. 1974).
[10] The sentence procedures set out in the act are usually described as "bifurcated". In reality, however, the statute creates three tiers in the sentencing process  the jury, the judge, and this Court.
[11] The statute defies uniformity at the outset by limiting our review to only the capital cases where the judge imposes death.
[12] In Furman, Justice Douglas traced the origins of the Eighth Amendment to the United States Constitution, suggesting that it was rooted in part in earlier but familiar discretionary prejudices applied against minorities, the poor and the unpopular. 408 U.S. at 240-57, 92 S.Ct. 2726. Even if those evils can be said to be overcome by the inclusion on juries of a representative societal mix, the Florida death sentence statute operates to destroy, not preserve, that saving feature. No one could seriously contend that a similar societal mix is evident on either the trial or appellate benches of this state, and in the only two cases brought to us for review in which there has been a jury-judge disagreement under the statute, the jury's recommendation has been discarded. Sawyer v. State, 313 So.2d 680 (Fla., filed Feb. 19, 1975); Gardner v. State, 313 So.2d 675 (Fla.. filed Feb. 26, 1975).
[13] Anderson v. State, 267 So.2d 8 (Fla. 1972).