**Charles Kenneth FOSTER, Petitioner,**

v.

**Charles G. STRICKLAND, Jr., et al., Respondents.**

No. TCA 81–0847.

United States District Court, N. D. Florida, Tallahassee Division.

July 2, 1981.

---

Steven L. Seliger, Tallahassee, Fla., Richard H. Burr, III, Southern Prisoners Defense Committee, Nashville, Tenn., for petitioner.

Gregory C. Smith, Asst. Atty. Gen., Tallahassee, Fla., for respondents.

## MEMORANDUM OPINION DENYING PETITION FOR WRIT OF HABEAS CORPUS

HIGBY, District Judge.

Charles Kenneth Foster challenges the legitimacy of his convictions for first degree murder and robbery, confinement, and death sentence in his habeas corpus petition. On May 26, 1981, when Foster filed his petition, he was scheduled for electrocution June 3, 1981. I stayed his execution because Foster was entitled to and had not received an evidentiary hearing on at least one of his claims, the competency of his trial counsel. June 18, 1981, I held an evidentiary hearing on the issues raised by the petition. In a pre-hearing memorandum and at the hearing Foster's lawyer, with commendable candor and realism, abandoned three of his issues. The abandoned three are: (1) the challenge to the reasonable doubt jury instruction in the guilt phase; (2) the challenge to jury consideration of the felony-murder aggravating circumstance; and (3) the challenge to the jury venire's composition. The remaining issues fall into two categories, one evidentiary issue and strict legal issues, and will be discussed under those headings. I first summarize the bare facts surrounding Foster's conviction to place the various claims in perspective. I will then address each remaining issue.

### SUMMARY

There was little doubt from the beginning that early in the morning of July 15, 1975, Foster killed Julian Lanier. Foster and Lanier met the evening before in Tot's Bar where they got acquainted over a few drinks. At Lanier's suggestion Foster agreed to find some women who would hire out for recreational sex. They traveled in Lanier's camper to the Bay Shore Bar where Foster, with Lanier's financial backing, found two women who agreed to their proposition. The foursome drove to a secluded place to party. There the party ended. Foster beat Lanier bloody and then, after talking to him briefly, slit his throat. While Foster and the women were covering Lanier with leaves and branches, Lanier made sounds of life which inspired Foster to slice his cervical spine.

Foster was arrested, given a first appearance, and appointed counsel on July 15, 1975, the day of the murder (P. Ex. 17). Five days later Foster gave a detailed confession to Bay County Sheriff's Office Investigator Joe Coram. A motion to suppress (P. Ex. 11) that statement, submitted on stipulated facts, was denied (P. Ex. 1–D, p. 458). After Foster's counsel filed a Suggestion of Insanity (P. Ex. 14), the court appointed three psychiatrists to examine Foster. The matter of Foster's competency to stand trial was submitted to the court on the basis of the psychiatrists' report (P. Ex. 18). The court found Foster competent to stand trial on September 25, 1975 (P. Ex. 14).

October 1, 1975, through October 4, 1975, Foster was tried by jury. The jury found him guilty and recommended the death sentence. Judge Spear sentenced Foster to death, and the Florida Supreme Court affirmed the conviction and sentence. *Foster v. State*, 369 So.2d 928 (Fla.1979). The United States Supreme Court denied Foster's petition for certiorari October 1, 1979. Governor Graham signed Foster's death warrant on May 5, 1981. Foster sought a new trial and sentencing proceeding in Florida courts on May 12, 1981, under Florida Rule of Criminal Procedure 3.850. The court denied his 3.850 motion. The Florida Supreme Court affirmed that denial. *Foster v. State*, 400 So.2d 1 (1981). Shortly afterwards, on May 29, 1981, I stayed Foster's execution. *Foster v. Strickland, Jr.*, 515 F.Supp. 22.

### THE EVIDENTIARY ISSUE

One of Foster's habeas issues requires an evidentiary determination. It is his claim of ineffective assistance of counsel.

#### Ineffective Representation

Foster alleges six instances of ineffective representation: (1) failure to investigate and raise an insanity defense and to present

mitigating psychiatric evidence during the trial's sentencing phase; (2) failure to raise Foster's alleged incompetency at trial; (3) mentioning the parole considerations of a life sentence without requesting an appropriate limiting instruction; (4) failure to request an instruction telling the jury to disregard evidence of Foster's criminal past; (5) failure to object to the questions which elicited the testimony about earlier crimes; (6) failure to challenge the jury venire's composition. This last claim I assume included in Foster's abandonment of his challenge in this proceeding to the jury venire, particularly since no evidence was presented on the subject. The others will be individually addressed.

The United States Constitution's guarantee of due process includes a guarantee of effective assistance of counsel. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (recognizing the right in certain capital cases); *Brooks v. Texas*, 381 F.2d 619, 624 (5th Cir. 1967), (footnote omitted), ("An indigent defendant is entitled to the effective assistance of counsel").

> Effective counsel does not mean 'errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance.' *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960), *modified*, 289 F.2d 928 (5th Cir. 1961), *cert. denied*, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). This necessarily 'involves an inquiry into the actual performance of counsel in conducting the defense ... based on the totality of the circumstances and the entire record.' *United States v. Gray*, 565 F.2d 881, 887 (5th Cir.), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1978).

*Beavers v. Balkcom*, 636 F.2d 114, 115 (5th Cir. 1981).

### The Lawyer's Qualifications

The reasonable likelihood of Foster's lawyer, Virgil Mayo, rendering effective assistance cannot seriously be questioned. In 1975 Virgil Mayo had been a member of The Florida Bar for 24 years. All of that time except for about eight months of 1952 was spent as a practicing lawyer. Mayo had been Public Defender of Florida's Fourteenth Judicial Circuit since 1963, the year the legislature created the position. He had tried hundreds of cases. Although Foster is the only defendant tried for a capital offense Mayo has represented since the current death penalty statute was enacted, he represented several capital defendants charged under Florida's earlier law. His record is impressive. Two clients got jury verdicts of acquittal. One got a binding jury recommendation of mercy. The fourth's trial ended in a mistrial and was later plea-bargained out as a manslaughter case. Mayo's experience included more than twelve cases involving psychiatric defenses. He also served three years on the Panhandle Mental Health Board.

This recital of Mayo's experience describes only cases in which he was lead counsel. His experience is more extensive. As Public Defender he has served as an advisor and overseer in hundreds of cases. In addition Mayo was assisted at Foster's trial by a new assistant public defender, Bill Wager. Wager's qualifications and actions during Foster's trial have not been questioned. And I know from having observed Wager in action many times that he is an intelligent, dedicated, innovative, highly competent criminal defense attorney. These facts show Foster was represented by experienced, competent counsel.

### Investigation of Psychiatric Defenses

■ Foster's allegations of ineffectiveness, however, focus not upon his lawyer's qualifications but his conduct. Mayo, Foster claims, did not render reasonably effective assistance. Eight specific actions are claimed to show ineffectiveness. One of the most major is the claim that Mayo did not adequately investigate and present psychiatric defenses for Foster.

Mayo officially took over Foster's case from an assistant on September 10, 1975 (P. Ex. 1–A), although he was aware the case would be his at least a week earlier. Mayo's investigation was thorough. He reviewed the reports of the three appointed

psychiatrists. In addition, he reviewed extensive medical records from the Bay County Memorial Hospital (P. Ex. 7), Florida State Hospital (P. Ex. 8), and the Bay County Guidance Clinic (P. Ex. 9). Mayo held at least ten conferences with Foster. His assistant, Wager, met with Foster five additional times. Mayo talked to Foster's mother. To all this Mayo added a valuable personal resource, his long-time residence in the area, his extensive family ties, and his knowledge of Foster.

"An attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense." *Davis v. Alabama*, 596 F.2d 1214, 1217 (5th Cir. 1979). Mayo's primary alleged investigative failing was not obtaining the medical records. The facts show he did. Foster also alleges Mayo did not talk to an important lay witness, his mother. Again the facts show he did. Mayo did not talk with Foster's siblings. Much of their testimony at the hearing revealed Foster's unsavory history of self-mutilation, rape, alcohol abuse, drug abuse, a fondness for knife fighting, and beating his family members. Mayo was aware of much of this, especially Foster's reputation with a knife, through his community contacts. Most of this information was also in the medical records Mayo reviewed. In short, the facts revealed at the hearing show Mayo's investigation unearthed almost all the information Foster claims Mayo failed to investigate. Foster has not proven his claims of ineffective investigation. Mayo's investigation of possible psychiatric defenses was more than adequate.

*Presentation of Psychiatric Defenses*

*Competency to Stand Trial*

██ Before trial Mayo questioned Foster's competency to stand trial. Three court-appointed psychiatrists examined Foster. All three found Foster competent to stand trial (P. Ex. 4–A). Two of the doctors had treated Foster before. One, Dr. Sapoznikoff, had treated Foster three times; once in 1972, once in 1973, and once in 1974. He was well informed about Foster's medical history, including his hospitalization in the Bay County Memorial and Florida State Hospitals as well as at the Bay County Guidance Clinic. Mayo allowed the judge to decide Foster's competency upon the basis of those reports. That decision is challenged as ineffective.

Foster argues and his experts testified that Mayo should have asked for a hearing and put the psychiatrists on the stand. Mayo did not ask for a hearing because he felt it would be useless. From his experience he believed that most psychiatrists, including these three all of whom he was familiar with, would not change their opinion once it was down in writing. My 15 years of trial experience cause me to agree with Mayo's evaluation of the situation. Over the years I examined a large number of psychiatrists. Once in a while a psychiatrist might vacillate from a written opinion, but I have never seen one retract an opinion. Mayo's submission of the competency issue was a realistic, effective decision.

During the trial Foster took the stand. While he began by recounting a version of the murder blaming the women, he ended confessing:

> I believe that she is the one that killed the man because—fuck it, I reckon I'll just cop out. I have done it, killed him deader than hell. I ain't going to set up here, I am under oath and I ain't going to tell no fucking lies. I will ask the Court to excuse my language. I am the one that done it. They didn't have a damn thing to do with it. It was premeditated and I intended to kill him. I would have killed him if he hadn't had no money and I know I never told you about it, but I killed him.

(P. Ex. 1–D, pp. 510, 511). Immediately after Foster's dramatic confession Mayo moved for a continuance and for additional psychiatric examinations (P. Ex. 1–D, p. 512). The motion was denied (P. Ex. 1–D, p. 516).

During the trial Foster was taking a mild sedative, Valium. His dosage was ten milligrams three times a day. He took the first dose noon the first day of trial and as

prescribed afterwards. Mayo was not aware of this at trial, but Foster informed him of it through a letter to Wager shortly after the trial.

Foster argues Mayo ineffectively raised the competency to stand trial issue when Foster confessed. His focus is on Mayo's failure to notice during trial or raise posttrial Foster's use of Valium. One alleged fact Foster relies on I find did not exist. Foster claims he slept through much of the trial. I find he did not, although he may have laid his head on the table momentarily once or twice.

Perhaps Mayo should have filed a motion for new trial alleging incompetence at trial and informing the court of Foster's Valium use. It would, however, have been a motion destined for denial. Foster had been treated with and seriously abusing much stronger drugs. In fact 30 milligrams a day was the smallest Valium dosage prescribed for Foster in his years of medical treatment. That dosage would have had no effect on Foster, a chronically nervous person, except to relax him a bit. The fact that he had been without Valium at least a month before trial is insignificant. Since Valium is a long-lasting, cumulative drug, his abstinence actually lessened the Valium's effect compared to what it would have been if he had been taking it for some time before the trial. I find Mayo effectively questioned Foster's competency at trial.

### The Insanity Defense

■ Foster claims Mayo's failure to present an insanity defense was ineffective. The decision to not present the insanity defense was Foster's, not Mayo's. In Mayo's opinion the best defense strategies available were seeking a conviction of the lesser included offense, second degree murder, or pleading not guilty by reason of insanity. He explained his strategies and reasoning to Foster. He particularly favored seeking a second degree conviction. His theory was sound. Second degree murder included

> The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual . . . .

§ 782.04(2), Fla.Stat. (1975). The maximum punishment was 30 years' imprisonment. § 775.082(3)(b), Fla.Stat. (1975). Mayo believed that with the psychiatric evidence available, some rather bizarre behavior by Foster before and during the murder, and the circumstances (especially the fact that the victim died while drinking and using a prostitute) he could convince the jury to return a second degree verdict.

Foster rejected the defense. He wanted to "walk or burn." Despite his many arrests Foster had never been convicted, and he was convinced he could talk his way out of jail. It will be my word against the womens' was his reasoning. Mayo pointed out the fallacy of Foster's plan. Two eyewitnesses, he said, would be hard to counter, and Foster's confession would be devastating despite Foster's explanation that the women had just convinced him he killed Lanier. Mayo tried many times to change Foster's mind. But Foster was adamant— "Walk or Burn."

Foster rejected an insanity defense for the same reasons. As with the second degree murder strategy, Mayo explained the defense and its consequences. He accurately informed Foster that a not guilty by reason of insanity verdict might lead to some time in a mental hospital. A person acquitted for cause of insanity could be treated as insane and incarcerated "[i]f the discharge or going at large of such . . . person shall be considered by the court manifestly dangerous to the peace and safety of the people . . . ." Fla.R.Crim.P. 3.460 (1975). Given Foster's long history of violence and the brutality of the murder it was highly likely that if acquitted by reason of insanity, he would be confined for a good while in a mental hospital. This possibility of confinement caused Foster to reject an insanity defense.

"Informed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of

his case are cornerstones of effective assistance of counsel." *Gaines v. Hopper*, 575 F.2d 1147, 1149–1150 (5th Cir. 1978). Informed evaluation of potential defenses and a meaningful discussion of the case's realities are what Mayo gave Foster. Foster insisted on not following Mayo's advice. After properly advising Foster and trying to convince him to follow the advice, Mayo had no choice but to honor Foster's wishes and forego the insanity defense and forego seeking a second degree conviction.

*Psychiatric Evidence in the Sentencing Phase*

█ Foster's final major challenge to Mayo's effectiveness questions Mayo's performance in the trial's sentencing phase. Florida's capital punishment statute creates a two-step proceeding. In step one, the guilt phase, the jury determines a defendant's guilt or innocence of the capital felony. If the defendant is convicted of a capital felony, the judge conducts a separate sentencing proceeding, the sentencing phase to determine whether death should be imposed. § 921.141(1), Fla.Stat. (1975). The proceeding is held before a jury which renders an advisory sentence. Eight aggravating and seven mitigating circumstances must be considered. §§ 921.141(2), (5), (6), Fla.Stat. (1975). The judge then considers the jury recommendation, weighs the aggravating and mitigating circumstances, and imposes sentence. § 921.141(3), Fla. Stat. (1975). "In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections (6) [sic] [aggravating circumstances] and (7) [sic] [mitigating circumstances] and upon the records of the trial and the sentencing proceedings." § 921.141(3), Fla.Stat. (1975). The conviction and death sentence are automatically reviewed by the Florida Supreme Court. § 921.141(4), Fla.Stat. (1975).

> Upon an appeal from the judgment by a defendant who has been sentenced to death the appellate court shall review the evidence to determine if the interests of justice require a new trial, whether the insufficiency of the evidence is a ground of appeal or not.

Fla.R.App.P. 6.16(b) (1975). *See*, Boyd and Logue, *Developments in the Application of Florida's Capital Felony Sentencing Law*, 34 U.Miami L.Rev. 441 (1980), for a thorough review of Florida's death sentence statute.

Foster thinks Mayo was ineffective in the sentencing phase because he did not adequately present two mitigating circumstances: (1) "The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance", section 921.141(6)(b), Florida Statutes (1975), and (2) "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law were substantially impaired", section 921.141(6)(f), Florida Statutes (1975).

Mayo presented evidence relevant to these factors. He specifically focused upon only one factor, extreme mental or emotional disturbance. He felt the psychiatric mitigating circumstances would be difficult for an unsophisticated Bay County jury to understand and likely to be ignored as technicalities by a jury outraged by the murder's brutality. Consequently he focused upon seeking mercy. To that end he put Foster's ex-wife on the stand. He felt she would evoke the jury's sympathy while presenting evidence from which he could also argue the psychiatric mitigating factors. She testified about Foster's self-mutilation and suicidal urges and the apparent lack of reason for his actions. Her testimony, albeit on cross-examination, was moving.

> He is a very sick person and I have begged for help for him and so has his mother and we could not get any help from nobody. They would rather put him in the electric chair and kill him than send him to an institution where he can get help. He has been to the mental health unit on a whole lot of occasions and they let him out and they give him pills to calm his nerves and the Judge won't do anything. He promised that he would. I have talked to Dr. Mason and

he promised he would and I talked to Dr. Cluxton and he promised he would. And Everybody at the Bay County Sheriff's Department knows me and any time I have ever had any occasion to talk to any of them, asking them to do something for him and nobody will. And they still won't because it's much easier to just go ahead and electrocute him and get it over with so they don't have to worry about somebody whose mind is bad. If he had T.B. or anything they would put him in an institution and they would help him where he couldn't hurt anybody but just because his mind is bad people don't understand that. They think it's all right just to go ahead and get him out of society. But why didn't they get him out of society before a crime like this had to be committed.

(P. Ex. 1–E, pp. 625–626).

Mayo also put Dr. Mason, one of the examining psychiatrists, on the stand. Through Mason the jury learned Foster had received psychiatric treatment four times since 1968, that he had been diagnosed paranoid, and was suicidally depressed. Records of a 1970 proceeding to determine Foster's competency were also introduced.

From the evidence introduced Mayo argued for a life recommendation. His argument actually began during voir dire where he asked several jurors whether they would consider mental or emotional disturbance as a mitigating factor in sentencing (P. Ex. 1–B, pp. 131, 133–135, 149). One prospective juror spontaneously mentioned mental disorders during voir dire (P. Ex. 1–B, p. 175). This indicates all the jurors, not just the ones questioned, realized a mental or emotional disturbance was important in sentencing. In any event the jury which unanimously recommended Foster's death included five jurors Mayo had questioned on the subject (P. Ex. 1–B, pp. 133–135; P. Ex. 1–E, pp. 653–654). During voir dire Mayo also emphasized mercy to the jury (P. Ex. 1–B, pp. 130, 132–136, 149–151, 163, 174, 182, 186, 195). The jury was instructed upon all mitigating circumstances (P. Ex. 1–E, pp. 648–649).

Building upon voir dire, the evidence, and the instructions Mayo argued for mercy emphasizing the mental or emotional disturbance mitigating factor as a reason to recommend life (P. Ex. 1–E, pp. 636–639). His use of Foster's ex-wife's testimony was particularly persuasive. He argued:

You know, I would like to almost join that girl that was on that stand in crying out; in crying out as much money as we spend. And it's a shame that I live in a society that thousands and thousands and thousands and literally millions of dollars that are spent that we don't—that we don't know much about the mind. You know the reasons that officials haven't done anything I guess, we are treating minds about like the Indians treated boils with some wet moss. We are not even to the stage of treating the mind to where we can lance a boil, much less have penicillin. We know less about the mind than anything else. Yet in our ignorant society the State askes [sic] you to kill a person.

That little girl cried out. She cried out if you are sick with tuberculosis, if you are sick with tuberculosis we treat it and we do. In my generation we have learned how to treat this. And I don't believe that forever we will continue to treat the mind by putting wet moss on it. I think that we are on the threshold of treating the human mind. And I think the reason for twenty-five years of holding a person in this thing with somebody that was compassionate and somebody says well during this period of time, you know, laws could be amended but if we are going to keep them there and I am asking for the life. I am asking for each of you to recommend to this Court that this life be saved because mitigating and extenuating circumstances exist.

(P. Ex. 1–E, pp. 638–639).

A lawyer's effectiveness is evaluated "on the totality of the circumstances and the entire record." *United States v. Gray,* 565 F.2d 881 (5th Cir. 1978), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1978). In Foster's case the totality of the

circumstances included a new statute. Florida's death penalty law was enacted in 1972. Ch. 72–724, § 9, Laws of Fla. When Mayo tried the case there were only ten Florida Supreme Court opinions interpreting the death penalty law. *Alvord v. State,* 322 So.2d 533 (Fla.1975); *Swan v. State,* 322 So.2d 485 (Fla.1975); *Slater v. State,* 316 So.2d 539 (Fla.1975); *Proffitt v. State,* 315 So.2d 461 (Fla.1975); *Sawyer v. State,* 313 So.2d 680 (Fla.1975); *Gardner v. State,* 313 So.2d 675 (Fla.1975); *Spinkellink v. State,* 313 So.2d 666 (Fla.1975); *Taylor v. State,* 294 So.2d 648 (Fla.1974); *Lee v. State,* 294 So.2d 305 (Fla.1974); *State v. Dixon,* 283 So.2d 1 (Fla.1973). None of them interpreted the mitigating circumstances. One thing was clear. Jury recommendations of life were very important. *See, Swan v. State,* 322 So.2d 485 (Fla.1975); *Taylor v. State,* 294 So.2d 648 (Fla.1974). Supreme court review was in light of the facts, and the jury found the facts. *Alvord v. State,* 322 So.2d 533 (Fla.1975).

Important evidentiary considerations were also involved. If Mayo introduced Foster's medical history and testimony of his relatives as Foster says he should have, a great deal of highly prejudicial evidence would have come along. The jury would have learned that Foster once took his mother's car from her at knifepoint; that he raped two women, one of whom was his sister-in-law; that he had been arrested a number of times for violent crimes; and that he once told his mother he was going to kill his little brother and cook him for supper.

In light of the law, or lack of it, and the evidence available, Mayo's decision to try talking the jury into a life sentence through use of emotional testimony, psychiatric testimony, and a good old-fashioned appeal to mercy was reasonable. After considering Mayo's handling of the sentencing phase, I cannot conclude it was ineffective. Another lawyer may have done it differently. Another lawyer may have done it better. Another lawyer may have done it worse. But Mayo was not ineffective.

*Parole Considerations*

From voir dire through closing argument Mayo emphasized to the jury that a life recommendation would mean at least 25 years' imprisonment without parole for Foster. This should not have been done, Foster claims, without a limiting instruction telling the jury that 25 years was the minimum time he would serve. Mentioning parole without a limiting instruction, according to Foster, invited the jury to recommend death in order to prevent him mistakenly being paroled later. However, "[a]dmittedly, Petitioner's [Foster's] former counsel [Mayo] may well have brought the issue of parole before the jury in order to impress upon the jury the severity of a life sentence in Florida . . . ." Petitioner's Prehearing Memorandum of Law, Doc. No. 18, p. 18, *Foster v. Strickland,* TCA 81–0847 (U.S.D. Ct.N.D.Fla. June 12, 1981). More plainly put, Mayo's reference to 25 years without parole would discourage the jury from recommending death to avoid early parole. The strategy was well chosen. It may have been better implemented with the addition of a limiting instruction. But it is effective counsel, not perfect counsel Foster is entitled to, and the strategy, as implemented, was effective.

*References to Foster's Criminal Record*

This issue has two parts. One is Mayo's failure to object to cross-examination questions eliciting testimony about Foster cutting one person and knifing his father and then leaving him in a ditch. The second is Mayo's failure to request a limiting instruction telling the jury to disregard references to Foster's criminal record. Under the existing law Mayo would have been justified in thinking the evidence was admissible. The statute provided for consideration of "any matter that the court deems relevant to sentence" and admission of any "evidence which the court deems to have probative value . . . regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements." § 921.141(1), Fla.Stat. (1975). Just

two weeks before Foster's trial the supreme court interpreted section 921.141(1) broadly.

> There should not be a narrow application or interpretation of the rules of evidence in the penalty hearing, whether in regard to relevance or to any other matter except illegally seized evidence.

*Alvord v. State*, 322 So.2d 533, 539 (Fla. 1975).

Again, ideally Mayo should have objected to the questions and asked for a limiting instruction. But his failure to do so does not amount to ineffectiveness. This claim highlights the "Catch 22" nature of the ineffectiveness claims. The evidence Foster says Mayo should have objected to is included in the medical records and family member testimony Foster says Mayo should have introduced.

### THE NON–EVIDENTIARY ISSUES

The remaining issues raised in Foster's petition may be disposed of as a matter of law. Each will be addressed.

### Incompetency at Trial

■ Foster's position on his incompetency at trial was summarized in the evaluation of his ineffective assistance of counsel claim. Review of the state trial court's determination that Foster was competent to stand trial is foreclosed by *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). That decision forbids federal review of a state court decision based upon independent state grounds. Here the independent state ground foreclosing review is abandonment on appeal. Mayo raised and preserved the issue of Foster's competency at trial. The issue was not raised in his appeal to the Florida Supreme Court and was therefore abandoned, as it should have been. Appellant's Initial Brief, *Foster v. State*, Fla.S.Ct. Case No. 40,380 (filed May 7, 1976) (hereinafter cited App.Int. B.).

### Admissibility of Foster's Confession

■ Foster claims his confession was obtained through violating his right to counsel and should not have been admitted. The issue was raised at trial on stipulated facts and abandoned, as it should have been, on appeal. App.Int.B. *Wainwright v. Sykes, supra,* forecloses review. In addition the factual findings implicit in the trial judge's ruling, which under Title 28, United States Code, Section 2254(d), are binding on me, support denying the motion because Foster initiated the statement. *Edwards v. Arizona*, —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

### Evidence Constitutionally Insufficient to Prove Robbery

The record supports the state court's factual determination that Foster committed robbery. *See, Foster v. State*, 369 So.2d 928 (Fla.1979).

### Impartial Jury Denied by Exclusion of Juror Smith

■ The trial court removed Joe Smith from the jury panel because of his objections to the death penalty. Smith said he would never vote for a death sentence or for guilt if the conviction could result in a death sentence (P. Ex. 1–B, pp. 23–25). His statements amounted to "compelling prejudice against the death penalty" or near "resolve to vote against it blindly and in all circumstances" which constitutionally justify a court excluding a juror. *Burns v. Estelle*, 592 F.2d 1297 (5th Cir. 1979).

### Trial Court Mishandling Evidence in Penalty Phase

This argument challenges the admission during the sentencing phase of graphic pictures of the deceased and the court not instructing the jury, on its own motion, to disregard references to Foster's criminal record. The contention is meritless.

### "Heinous, Atrocious, and Cruel" Jury Instruction

One aggravating circumstance set forth in Florida's death penalty law and used to justify Foster's death sentence is "[t]he capital felony was especially heinous, atrocious, or cruel." § 921.141(5)(h), Fla.Stat. (1975). This provision was part of Florida's statute

when the United States Supreme Court considered and approved it in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Foster claims it is unconstitutionally vague. *Proffitt* mandates rejection of this claim.

### Mitigating Circumstances Jury Charge

 Foster's jury was told:

Should you find one or more of these aggravating circumstances to exist it will then be your duty to determine whether or not sufficient mitigating circumstances exist to outweigh the aggravating circumstances found to exist.

(P. Ex. 1–E, p. 648). The statutory mitigating factors were listed next. Then the judge instructed:

If one or more aggravating circumstances are established you should consider all the evidence tending to establish one or more mitigating circumstance and give that evidence such weight as you feel it should receive in reaching your conclusions as to the sentence which should be imposed.

(P. Ex. 1–E, p. 650).

Foster argues these instructions are impermissible under the holding in *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 990 (1978) (footnotes omitted), that "the sentencer, in all but the rarest kind of capital case, [must] not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." This issue was not raised at trial, and is, therefore, barred by *Wainwright v. Sykes, supra.* Also, Florida's law is not like Ohio's, which required a death sentence unless one of three circumstances were proven. Florida's law allows the sentencer to consider and weigh mitigating circumstances as it sees fit.

### Findings of Fact by Jury and Judge Justifying Death Sentence

Foster argues that the Constitution requires written findings from judge and jury specifying the mitigating and aggravating circumstances found and considered. Foster was sentenced to death in a procedure approved by the Supreme Court. *Proffitt v. Florida, supra.* Also, *Wainwright v. Sykes, supra,* bars this claim since it was not raised at trial.

### Florida Supreme Court's Review of Post-Sentencing Psychiatric and Investigative Reports

 Foster has alleged the Florida Supreme Court secretly obtained and reviewed psychiatric and/or investigative reports concerning him during its consideration of his appeal. He was one of several prisoners who petitioned the Florida Supreme Court for relief on that ground. The court held a claim for relief had not been stated because its function as a reviewer rather than sentencer made its consideration of such documents irrelevant. *Brown v. Wainwright,* 392 So.2d 1327 (Fla.1981). A petition for certiorari is pending before the United States Supreme Court. *Brown v. Wainwright, cert. pending,* U.S.S.Ct. No. 80,6434 (April 3, 1981). I adopt the reasoning of the Florida Supreme Court and hold Foster's allegations do not state a claim for relief.

### Florida's Death Penalty is Applied in an Arbitrary and Unconstitutional Manner

This contention merely argues that all the other alleged errors make Foster's death sentence irrational and arbitrary. It is meritless.

## SOME FINAL MATTERS

### Foster's Counsel

At some point Foster may decide to challenge the effectiveness of his counsel in this proceeding, Richard H. Burr, III. In anticipation of that possibility, I record my observations on Burr's effectiveness. Burr has done a good job. His pleadings have been well written and thorough. The memo he filed was well researched, well written, and quite helpful. Burr clearly took pains to present the law accurately and forthrightly abandoned claims he found unsupportable.

In court he was an effective examiner and a gentleman. This decision simply applies the law to the facts. It is no reflection upon his abilities.

### Delay

In argument on the Motion for Stay the State complained vociferously of Foster's alleged delay in bringing this petition. Rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Court provides for dismissal of delayed petitions. The State never moved for dismissal under this rule. If its complaints were well founded, a motion should have been made. If the complaints were not well founded, they should not have been made. The comments made at the hearing insinuated Burr or Foster deliberately waited as long as possible to file the petition in order to delay Foster's execution. Such charges about Burr are insults to a capable lawyer, obviously working with a handful of other lawyers to represent the hundreds of people sentenced to death, probably at great personal sacrifice. Such charges about Foster are ludicrous. To imagine a semi-literate indigent plotting his federal litigation strategy is hard. Blame for the delay in this case is more fairly placed upon the Florida Supreme Court which took two years and five months to decide Foster's appeal and the State of Florida which does not provide indigents sentenced to death lawyers for their collateral litigation.

### JUDGMENT

Foster's Petition for Habeas Corpus is denied. The stay in this case is vacated.