842 So.2d 817 (2003)
Harry BUTLER, Appellant,
v.
STATE of Florida, Appellee.
No. SC95158.
Supreme Court of Florida.
April 3, 2003.
*820 James Marion Moorman, Public Defender, and Kevin Briggs, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal Harry Butler's conviction for first-degree murder and his *821 sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm Butler's conviction and his sentence.

FACTUAL AND PROCEDURAL BACKGROUND
On the night of March 13, 1997, or early morning hours of March 14, 1997, Leslie Fleming (Fleming), also known as Bay, was stabbed multiple times and asphyxiated by her former boyfriend, Harry Butler (Butler). Shawna Fleming (Shawna), Leslie's sister, discovered Fleming's body at about 7:15 a.m. on the morning of March 14 when LaShara Butler (LaShara), the couple's six-year old daughter, opened the apartment door for Shawna. According to LaShara's trial testimony, on the night before the body was discovered, she had been sleeping with her mother when her father entered the bedroom, picked her up, and took her to her own room. LaShara testified that she saw his face during this process. LaShara also stated she heard her mother say, "Stop," saw her father's leg pinning down her mother's leg, and heard her mother screaming as though she were being hurt. Officer Scott Ballard, one of the first officers on the scene, testified that on the way to the police station, LaShara said, "My daddy hurt mommy. I heard him yelling at her."
Lola Young, a long-time neighbor of Fleming's who had also known Butler for some time, testified she saw Butler hiding in the bushes near Fleming's apartment between 3:30 and 4 a.m., around the same time as the murder. She also stated that soon after seeing Butler, she saw a blue car speed through the housing complex, stop abruptly, pick up Butler, and speed off. Latwanda Allen (Allen) testified that she, Butler and Martisha Kelly (Kelly) are cousins. Allen said Kelly told her Butler killed Fleming. At trial, Kelly denied having made the statement.
Detective Steffens testified that Kelly stated she went by Fleming's apartment the morning of the murder, looked through a window and noticed the apartment was in disarray. Steffens also testified he questioned Butler, and Butler denied any involvement in the murder. During the interview, Steffens noticed superficial cuts on Butler's hands, which Butler explained he received from falling off a bicycle and from a broken bottle. A broken beer bottle was found on the floor of Butler's room.
Detective Green testified Kelly told him the murder weapon could be found in a dumpster near a food store where a pair of blue shorts, a white T-shirt, a pair of underwear, a towel, and a pair of tennis shoes having no laces were eventually found. However, no weapon was recovered from this location. Dr. Jeannie Eberhardt, a forensic scientist specializing in DNA serology, testified she found the presence of blood on the white T-shirt, but she was unable to confirm a DNA profile of the blood. Blood stains found on the denim shorts, towel, and boxer shorts were also tested, with the same result. The blood was either of an inadequate amount or degraded. The dyes of the denim shorts inhibited DNA testing. However, testing of the sneakers revealed a DNA profile consistent with that of the victim.
Shawna testified that Fleming ended her relationship with Butler several months before the murder. On March 9 Butler moved out of the apartment at Fleming's request. He was present, however, in the apartment on March 11 when Shawna visited her sister. Fleming told Shawna to leave and call the police. One of the officers who arrived on the scene observed red marks on Fleming's back and an injury to her shoulder. Butler was arrested, but bonded out the next evening. Two *822 days after the incident with the police, Butler was again seen at Fleming's apartment. An employee of a cable company, John Dosher, was removing a cable box from the residence. He indicated that Fleming and Butler seemed affectionate with no animosity between them.
Lakisha Miller (Miller), Butler's cousin and Fleming's best friend, who was known as Red, testified she spent the night with Fleming, at Fleming's request, on the night of March 12. She said she last spoke with Fleming at 8 p.m. on the night of March 13. Miller testified that Butler did not like her and that he was upset over the breakup with Fleming. She also said Butler was upset because Fleming was having an affair with Adonis Hartsfield.
Terry Jackson, Butler's coworker and acquaintance for many years, testified that he gave Butler a ride the day before the murder. During that ride, Butler said he was going to kill Bay (Fleming) and Red (Miller).
Dennis Tennell (Tennell) testified that he shared a motel room with Butler on the night of the murder and that he allowed Butler to borrow a pair of his Nike sneakers the next morning because Butler's shoes were wet. Tennell identified the sneakers found in the dumpster as Butler's. Butler testified he and Tennell attended a party and arrived at their room around 2 a.m. Tennell left for an hour on a "dope run." At some time during the night, Butler noticed his blue and white Converse sneakers were missing and when he asked Tennell where they were, Tennell responded, "I'm on a mission with them." Butler then borrowed Tennell's black Nikes, which Butler was wearing when arrested. As Butler and Tennell left their room, the police confronted them. Tennell ran away and Butler was taken to the police department for questioning. Butler testified he did not know Fleming was dead at this time.
At the penalty phase, several family members, including Butler's father, Junior Butler, testified concerning Butler's early life. Prior to the death of his mother, Butler lived with his mother and father, with Junior Butler supporting the family on fifty dollars a week. Junior Butler indicated that he was tried and acquitted of the murder of Butler's mother when Butler was eight years old. After his mother's death, Butler went to live with his grandmother. Butler's sister, Sandra Butler, testified Butler protected her as a child. When their grandmother died, Junior Butler again took custody of Butler and his siblings. When Butler reached age eighteen, he moved out of his father's house.
On June 28, 1998, the jury recommended Butler be sentenced to death by a vote of eleven to one. The trial court denied Butler's motion for new trial at a hearing on August 7, 1998. On November 2, 1998, the trial judge conducted a Spencer[1] hearing during which the defense presented additional mitigating testimony from a psychiatrist, Dr. Michael Maher. Dr. Maher testified that he interviewed Butler concerning his use of drugs and his psychiatric background. Butler informed him that he used a lot of cocaine on the night of murder, but he also said he did not commit the murder. Dr. Maher indicated that one of the effects caused by the use of cocaine was irrational, repetitive actions. He opined that the number of stab wounds in this case suggests this type of behavior. Dr. Maher further opined that a child whose mother dies as a result of violence faces a great risk of participating in violence to resolve conflicts, especially *823 when this factor is coupled with other dysfunctional social activities, such as drug use.
On January 11, 1999, the trial judge concurred with the jury recommendation and sentenced Butler to death. The trial judge found one aggravating circumstance, that the murder was heinous, atrocious, or cruel (HAC). The defense requested two statutory mitigating circumstances, that the defendant was acting under the influence of emotional and mental disturbance and that his capacity to appreciate the criminality of his act was impaired. However, the trial judge found no statutory mitigating factors and four nonstatutory mitigating factors including: (1) Butler was reared without his natural mother (some weight); (2) Butler is a loving and good son (some weight); (3) Butler is well thought of by neighbors and coworkers (slight weight); and (4) Butler has a long-term substance abuse problem (slight weight). Butler filed a timely notice of appeal on February 9, 1999.
In this appeal Butler claims the trial court erred by: (1) permitting the State to elicit testimony concerning prior acts of violence allegedly committed by the defendant; (2) permitting an unqualified expert witness to testify concerning DNA evidence; (3) denying the defense motion for a new trial following the discovery of a probation violation report on one witness that was not disclosed by the State; (4) instructing the jury that the only proposed statutory aggravating circumstance had been established by the evidence; (5) failing to consider a statutory mitigating circumstance proposed by the defense during the penalty phase; and (6) imposing a death sentence that is excessive, disproportionate, and cruel and unusual punishment under the United States and Florida Constitutions.
We deny relief on all of Butler's claims and affirm both the finding of guilt and the sentence of death.

ISSUES

Prior Acts Of Violence
Butler first argues the trial court erred in allowing the prosecutor to ask him, Detective Marvin Green, and Theodore Dallas questions related to prior domestic violence allegations against him. Contending that this evidence was similar fact evidence, Butler argues this evidence should have been excluded because it was used only to show Butler's propensity to commit the crime charged or his bad character and because the probative value of this evidence was outweighed by the prejudice. See §§ 90.403-90.404, Fla. Stat. (1995).
On April 30, 1997, the State filed a notice of intent to use evidence of other crimes, wrongs, or acts committed by Butler. The notice specifically sought to introduce evidence of a March 11, 1997, domestic violence incident in which Butler allegedly sexually battered and assaulted Fleming. On July 14, 1997, Butler filed a motion to strike the State's notice, alleging the March 11 incident bore no similarity to the March 14 murder. He further argued such evidence was irrelevant and could only be used to show bad character and propensity of the defendant to commit violent acts. The defense filed a motion in limine on June 24, 1998, seeking to exclude the following evidence:
1. Any evidence of the Defendant's alleged statement, "gonna kill Bay and Red."
2. Any mention of Leslie Fleming's alleged fear of the Defendant.
3. Any mention that the Defendant allegedly kidnaped Leslie Fleming on or about March 11, 1997.

*824 4. Any mention that Defendant allegedly touched, struck or caused bodily harm to Leslie Fleming on or about March 11, 1997.
5. Any mention that the Defendant allegedly committed a sexual battery upon Leslie Fleming on or about March 11, 1998 [sic].
6. Any mention of prior allegations of abuse, physical or emotional, towards Leslie Fleming by the Defendant.
Defendant again alleged such evidence was irrelevant and that any relevance would be outweighed by the prejudice that would result from its admission.
At the June 23, 1998, pretrial hearing on this motion, defense counsel noted that a prior hearing had been held on the domestic battery charge before a different judge, who found the charge admissible to show motive. At the 1998 hearing, the present trial judge granted the motion to exclude the sexual battery and kidnapping (paragraphs three and five of the motion) to the extent that the State could not raise them in opening statement. Otherwise, the State was directed to approach the bench prior to introducing the evidence. The judge then denied the exclusion requested in paragraph four of the motion in limine to the extent it would be introduced to show motive or any other issue at trial. Defense counsel in fact conceded the domestic battery was relevant to this murder case. Finally, the judge ruled that any evidence presented in relation to statements Fleming may have made concerning previous abuse (paragraphs two and six) would be dealt with contemporaneously. The motion was denied as to any statements made by the defendant (paragraph one).
Generally, any evidence relevant to prove a material fact at issue is admissible unless precluded by a specific rule of exclusion. See § 90.402, Fla. Stat. (1997); Zack v. State, 753 So.2d 9 (Fla.2000). Collateral crime evidence, codified in section 90.404, Florida Statutes (1997), is also relevant and admissible if used to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. However, even relevant evidence will be inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice[2] or if introduced to prove defendant's bad character or propensity to commit the crime charged.[3]See Gore v. State, 719 So.2d 1197 (Fla.1998); Williams v. State, 621 So.2d 413 (Fla.1993); State v. DiGuilio, 491 So.2d 1129 (Fla.1986). As we stated in Bryan v. State, 533 So.2d 744, 746 (Fla. 1988):
The only limitations to the rule of relevancy are that the state should not be permitted to make the evidence of other crimes the feature of the trial or to introduce the evidence solely for the purpose of showing bad character or propensity, in which event it would not be relevant, and such evidence, even if relevant, should not be admitted if its probative value is substantially outweighed by undue prejudice.
We have consistently adhered to this principle in other cases where evidence is being introduced pursuant to Williams v. State, 110 So.2d 654 (Fla.1959).
In this case the evidence complained of was elicited during the cross-examination of three defense witnesses (including the defendant). A prosecutor can use cross-examination to delve further into issues raised during the direct examination and to impeach a witness's credibility. See *825 Steinhorst v. State, 412 So.2d 332, 337 (Fla.1982); Diaz v. State, 747 So.2d 1021, 1023 (Fla. 3d DCA 1999). Additionally, we have often said that cross-examination is not limited to the exact details testified to on direct examination but extends to the whole subject and all matters that modify, supplement, contradict, rebut or make clearer the direct testimony. See Chandler v. State, 702 So.2d 186 (Fla.1997); Geralds v. State, 674 So.2d 96 (Fla.1996). Although evidence of collateral crimes may be raised for these purposes, such evidence should not become a feature of the trial. The other crimes evidence in this case was used during Detective Green's cross-examination to elaborate on why the police believed Butler was a suspect. The evidence was used during Theodore Dallas's cross-examination to test his knowledge of the relationship between the defendant and the decedent. The other crimes evidence was used as impeachment during the cross-examination of Butler. Furthermore, the use of this evidence did not become a feature of the trial; it covered very little of the cross-examination of these witnesses.
During direct examination by defense counsel, Detective Green stated he had been reading e-mail about crimes committed in his patrol area during the same week as Fleming's murder when he heard a call of a possible homicide over his radio. He asked officers to confirm the address and noticed it matched the same address as shown in the e-mail concerning a domestic violence incident two days earlier involving Butler. Green then testified to seeing Butler and Dennis Tennell near the crime scene and approached them. As he did, Tennell[4] ran away, but Butler remained, voluntarily complying with Green's request to go down to the police station.
On cross-examination, the prosecutor again asked Green about the e-mail concerning the previous domestic violence incident in the context of how this e-mail, in conjunction with the address where the murder occurred, led the police to suspect Butler. As the prosecutor questioned Green, he began to delve into what was termed "the serious nature" of the allegations against Butler. The defense attorney objected and the trial judge told the prosecutor to stay away from the nature of the allegations.
The prosecutor asked these questions to determine the officer's knowledge about the identity of the possible perpetrator. This is a proper purpose under section 90.404(2)(a). While the prosecutor's characterization of the domestic violence incident as "serious" and "violent" was not necessary to achieve this purpose, no prejudice resulted from these comments since they were brief and immediately met by admonishment from the court. See, e.g., Jones v. State, 748 So.2d 1012 (Fla.1999); Oats v. State, 446 So.2d 90 (Fla.1984). Therefore, we find any error caused by this characterization to be harmless. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Butler also alleges error during cross-examination of his friend Theodore Dallas. On direct examination, Dallas indicated he was aware of the relationship between Butler and Fleming, a relationship which had begun some seven years earlier. Dallas further indicated there was no friction between Butler and Fleming. On cross-examination Dallas continued this theme and indicated Butler was not upset that Fleming was leaving him and seeing another *826 man. He indicated Butler and Fleming never had any problems.
After Dallas acknowledged the March 11 domestic violence incident, the prosecutor asked him about an April 24, 1993, domestic violence incident. During the bench conference after defense counsel's objection, the prosecutor argued defense counsel had opened the door to this line of questioning by eliciting information from Dallas about the nature of the relationship between Butler and Fleming. The prosecutor further argued he could properly test in his cross-examination the extent of Dallas's knowledge and what information he had on which to base an opinion. The trial judge overruled the objection and directed the State to limit the scope of questioning to the nature of the act about which the prosecution already had a factual basis.
When the prosecutor asked other questions concerning the 1993 incidents, defense counsel again objected on the basis that the prosecutor was going into the specifics of the incidents. The trial judge ultimately directed the prosecutor to ask Dallas if he was aware of any incident in which Fleming was allegedly touched or struck on the particular date in order to avoid making the prior abuse a feature of the trial. Dallas admitted to hearing rumors of abuse in the relationship, but stated many relationships had those kind of problems.
The purpose of the prosecutor's cross-examination of Theodore Dallas was to test his credibility concerning the relationship between Butler and Fleming. Section 90.608, Florida Statutes (1997), provides:
90.608 Who may impeach.Any party, including the party calling the witness, may attack the credibility of a witness by:
(1) Introducing statements of the witness which are inconsistent with the witness's present testimony.
(2) Showing that the witness is biased.
(3) Attacking the character of the witness in accordance with the provisions of s. 90.609 or s. 90.610.
(4) Showing a defect of capacity, ability, or opportunity in the witness to observe, remember, or recount the matters about which the witness testified.

(5) Proof by other witnesses that material facts are not as testified to by the witness being impeached.
(Emphasis added.) The prosecutor's questions specifically tested the basis for the witness's recount of the matters about which he testified, those matters being the lack of discord between the defendant and the victim. See Bonifay v. State, 626 So.2d 1310 (Fla.1993).
This Court has in prior cases found admissible testimony concerning specific acts committed by the defendant to rebut a witness's testimony describing the defendant as benign or to show motive or premeditation where the defendant has committed prior acts of violence against the same victim. See Pittman v. State, 646 So.2d 167 (Fla.1994) (found admissible prior threats against the murder victim and her family); Hildwin v. State, 531 So.2d 124 (Fla.1988) (finding the State could introduce rebuttal evidence of defendant's prior specific acts of misconduct and violence to rebut expert testimony that defendant would be a good prisoner). Admission of the evidence concerning prior incidents of violence against the victim was not error.
Butler next complains of the other crimes testimony elicited from him during the State's cross-examination. On direct examination by defense counsel, Butler indicated that he loved Fleming and that *827 they had made love on the Tuesday before the murder. He gave the impression that they had a good relationship and that he was not concerned about what may have been going on between Fleming and Adonis Hartsfield. He admitted to being arrested on March 11, 1997, but he indicated there had been an argument with Fleming, not serious fighting.
On cross-examination Butler again tried to minimize the circumstances of his arrest by indicating the couple had consensual sex on March 11 and by saying the ride in his car on that day was not against her will. He indicated the incident did not involve rape or kidnapping. However, he acknowledged that he was told the case was being referred to the prosecutor's office on felony charges. Additionally, during cross-examination and in response to Butler's assertion that he would never hurt Fleming, the prosecutor asked about a 1993 incident in which Butler choked Fleming.
When a defendant takes the stand, his credibility may be impeached in the same manner as any other witness. See Fotopoulos v. State, 608 So.2d 784 (Fla.1992). More specifically, impeachment may be through questioning concerning prior acts of misconduct in a situation where the defendant has testified on direct examination that he has not or would not participate in such misconduct. See Lusk v. State, 531 So.2d 1377 (Fla. 2d DCA 1988). In this case, Butler took the stand and testified he would never hurt the victim. The evidence concerning the 1993 incident was relevant to this issue; therefore, the trial court properly allowed cross-examination concerning the incident.
Prior to trial, the trial judge ruled that the March 11 domestic violence incident was admissible at trial to show motive. The defendant, however, maintains the prosecutor should not have questioned him about possible felony charges arising out of that incident. This question was relevant impeachment evidence given the fact that Butler was downplaying the seriousness of the events and said it was merely an "argument." Moreover, the questioning was relevant to the issue of motive based on the seriousness of these possible charges, and it helped put into context the defendant's statement to Dennis Tennell that he was going to kill Fleming. The trial court did not err in allowing this limited cross-examination because it tended to "modify, supplement, contradict, rebut, or make clearer the facts testified to in chief." Coco v. State, 62 So.2d 892 (Fla.1953).
In sum, the trial court did not err in allowing the cross-examination of three defense witnesses on other crimes evidence because the evidence was admissible to explain and modify direct testimony, was relevant and probative, and its probative value was not outweighed by the prejudicial effect.

Unqualified Expert Witness
Butler next contends DNA expert Dr. Jeannie Eberhardt was not qualified to testify to the frequency to which DNA profiles occurred in the population because she did not assist in creating the database that she used to determine the frequencies nor was she trained in statistics. We disagree and affirm the trial court's finding that the DNA expert was qualified to give an expert opinion.
DNA testing requires a two-step process, one biochemical and the other statistical. The first step uses principles of molecular biology and chemistry to determine that two DNA samples look alike. The second step uses statistics to estimate the frequency of the profile in the population. Both steps must satisfy the Frye test. See Brim v. State, 695 So.2d *828 268 (Fla.1997). The Frye test requires that the scientific principles or methodologies to which an expert testifies must be generally accepted in the scientific community before they will be considered valid in the courts. See Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923).
Butler relies on Murray v. State, 692 So.2d 157 (Fla.1997), in arguing that Dr. Eberhardt lacked the requisite knowledge to testify about her DNA testing and population frequencies. In Murray, the expert who testified had no knowledge about the database on which his population frequency calculations were based, repeatedly evaded questions about the procedures he used in his testing, and misled the court as to the scientific community's acceptance of PCR (Polymerase Chain Reaction) DNA testing[5] at that time. This Court ultimately found the expert was not qualified, but further held assembly or creation of the database is not necessary to testify to results. However, "a sufficient knowledge of the database grounded in the study of authoritative sources" is necessary. Murray, 692 So.2d at 164.
Contrary to Butler's assertion, Dr. Eberhardt was qualified to testify as to population frequencies of the DNA profile she discovered. Although she did not participate in the creation of the database, she was familiar with samples from which the database was created. Moreover, Dr. Eberhardt stated the Florida Department of Law Enforcement in Tampa conducted validation studies of its own on the database she used. Although these studies were conducted before she began working there, her training consisted of conducting "revalidations" of those databases.
Butler's argument at trial and in his brief before this Court that a person who was not involved in creating a database and who has no knowledge other than that contained in an article about a database cannot testify to her personal knowledge of the validity of a database misstates the holdings in Brim and Murray. In Brim we held the second step of the DNA analysis process, statistical probabilities, must meet the Frye test, and in Murray we found a particular expert unqualified whose testimony did not adequately give the population frequency of a DNA profile. Butler's argument, however, overlooks the fact that the Murray decision also states creation of the database is not a necessary prerequisite to testifying; a sufficient knowledge of the authorities pertinent to the database is an adequate basis on which to render an opinion. In Murray, the unqualified expert stated Murray's DNA sample matched the one recovered from the crime scene and "91.8 percent of the population would be anticipated to have different DNA types." Murray v. State, 692 So.2d at 163. This Court properly characterized that testimony as not enlightening since it did not demonstrate to the jury what segment of the population the profile was more likely to match.
Dr. Eberhardt's testimony did for the jurors what the expert's testimony in Murray could notit explained the significance of the information and data they were given. She testified the DNA profile of the blood on Butler's sneaker matched that of Leslie Fleming. She explained that she then calculated a statistical frequency that could tell her "how common or how rare that type of profile would be found in any given population." She concluded, "[T]he DNA profile found on the sneaker, as well as the DNA profile from Leslie Fleming occurs approximately one *829 in 3,000 in the African American population, approximately one in 112,800 individuals of the Caucasian, and approximately one in 538,000 in the Southeastern Hispanic population." This testimony quantitatively helped the jury and the trial court understand the importance of a DNA match. See Hayes v. State, 660 So.2d 257 (Fla.1995) (first case where this Court took judicial notice that DNA methodology conducted properly would satisfy the Frye test).
Butler also contends Dr. Eberhardt's use of the product rule to determine population frequencies was error. Several Florida cases, as well as cases from other jurisdictions, have accepted use of the product rule. See Brim v. State, 695 So.2d at 272 (observing that the NRC adopted the ceiling principle amid speculation that product rule calculations did not account for population substructures, but later disavowed the ceiling principle and renewed its approval of product rule calculations); Clark v. State, 679 So.2d 321 (Fla. 3d DCA 1996) ("[P]roduct rule calculations are appropriate as a matter of scientific fact and law.") (citing National Research Council, The Evaluation of Forensic DNA Evidence (prepublication copy 1996)); see also United States v. Bonds, 12 F.3d 540 (6th Cir.1993); United States v. Jakobetz, 955 F.2d 786 (2d Cir.1992).[6] Butler's contention is inaccurate in light of the case law that continues to uphold the validity of the product rule. This argument is without merit. Dr. Eberhardt was qualified to testify as an expert because her testimony was based on proven scientific principles.

Denial Of Motion For New Trial
Butler argues that the prosecution's nondisclosure of Lola Young's probation violation report compromised his right to a fair trial. Moreover, he argues the State had constructive knowledge of this report and is responsible for any adverse consequences flowing from its nondisclosure. The State argues the defense had the same access to the court file containing the probation report, and that even if the report had been disclosed, its use would have been limited, so no prejudice has ensued to the defendant. Thus, the State posits no violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), has been demonstrated.
The State is required to disclose to the defense evidence in its possession or control that is favorable to the accused or that tends to negate the guilt of the accused. See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Brady v. Maryland, 373 U.S. *830 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The defendant must prove three elements to establish a Brady claim: (1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence has been suppressed by the State, either willfully or inadvertently; and (3) prejudice has ensued. See Way v. State, 760 So.2d 903, 910 (Fla.2000) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).
While Butler has demonstrated this violation report was in the possession of the State and that it contained information that could have been used in impeaching Young, he has failed to demonstrate that this report was material. As this Court explained in Young v. State, 739 So.2d 553 (Fla.1999), an item of evidence is material if there is a reasonable probability that the outcome of the proceeding would have been different if the evidence had been disclosed. Thus, the question is whether in the absence of this evidence the defendant received a fair trial. We must also ask whether the suppressed evidence could reasonably be taken to put the case in such a different light that it undermines our confidence in the verdict. See Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
This prong of the Brady standard has not been satisfied because this violation report does not undermine our confidence in this verdict. There is no doubt that the defense had in its possession information concerning the witness's background. Lola Young was deposed on December 12, 1997, six months before trial. At the time of the deposition she was on probation. In response to questioning, Young indicated she was not only on probation but also in a drug treatment program. She also indicated she had several drug-related convictions. Thus, the defense was aware of both the witness's prior drug convictions and her present treatment for drug use and, based on this information, could have developed a line of inquiry as it related to her ability to perceive. This is the same line of inquiry Butler now says he could have pursued with the violation report.
Additionally, any error in the prosecutor's failure to disclose this violation report was harmless. When Young's testimony is weighed against the other evidence presented at trial, it does not minimize Butler's guilt. At trial, six-year-old LaShara testified she saw her father's face when he removed her from her mother's bed, and she said that later the same night she was awakened by her mother's screams and saw her father's leg pinning down her mother. The jury also heard and considered testimony that the tennis sneaker Butler had been wearing and that was found in a dumpster had blood on it matching Fleming's DNA.

Jury Instruction On Statutory Aggravator
Butler argues the jury instruction on the statutory aggravating circumstance of heinous, atrocious, or cruel indicated that the aggravator had been established and deprived the jury of its decision-making on this issue. This issue has not been preserved for review since no objection was made in the trial court. There was no objection made to the jury instructions once each party was apprised by the court of how the instruction would be worded. See Hazen v. State, 700 So.2d 1207, 1211 (Fla.1997). The defense's failure to object is illustrated by the following exchange that occurred during the trial regarding where to place the definition of the heinous, atrocious, or cruel aggravator.
THE COURT: Aggravating circumstance that can be considered is limited to the following that are the following.

*831 I think I'm going to leave that is the following established by the evidence or that is established by the evidence.
DEFENSE COUNSEL: If you are going to make it singular.
THE COURT: So I will put a comma in there by the following that is established by the evidence the crime for which and was conscious. It reads standing alone with aninsert special instruction at that point.
DEFENSE COUNSEL: Pardon me, Judge?
THE COURT: I inserted it right after that just before if you find the aggravating circumstances.
DEFENSE COUNSEL: That's fine, Judge.
No objection was made by the defense during this discussion. It is clear from this exchange that defense counsel accepted not only the placement of the definition of the HAC aggravator, but also the wording of the instructions related to it.
As the State points out, this issue is also without merit. The defense has proffered an argument based purely on semantics. The instructions given at trial on the heinous, atrocious, or cruel aggravator read as follows, in pertinent part:
The aggravating circumstance that you may consider is limited to the following, that is established by the evidence: The crime for which the defendant is to be sentenced was especially heinous, atrocious or cruel.
(Emphasis added.) The standard jury instructions on aggravators states: "The aggravating circumstances that you may consider are limited to any of the following that are established by the evidence." The only practical difference between the two instructions is that the one given at trial involved one aggravator while the standard jury instruction contemplates a situation where more than one aggravator has been established by the evidence. Defense counsel showed an awareness of this slight linguistic difference when he stated, "If you are going to make it singular" after the judge stated he would instruct the jury to consider a certain aggravator. Had defense counsel disagreed with these instructions, he should have objected at that moment. His failure to do so indicates his agreement with the court's version of the jury instructions.
We therefore deny relief on this claim.

Failing To Consider Statutory Mitigators
Butler next argues the trial court erred in failing to consider, as a separate mitigating circumstance, the evidence presented concerning his impaired mental capacity due to cocaine use. Although a jury instruction on this mitigator was given, the State maintains Butler abandoned this as a separate mitigator when it was not discussed in the defense sentencing memorandum to the trial judge. The memorandum included the statutory mental mitigator of extreme mental or emotional disturbance and the seven nonstatutory mitigators requested, including Butler's long-term substance abuse problem. The record indicates the trial judge considered and weighed all of the mitigating evidence offered by the defense.
Section 921.141(3), Florida Statutes (Supp.1996), requires specific findings as to both aggravating and mitigating factors. The State may not prevent the sentencer from considering any relevant mitigators and, likewise, the sentencer may not refuse to consider any mitigating evidence. See Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In Campbell v. State, 571 So.2d 415 (Fla.1990), this Court sought to clarify and make more uniform the application of the law pertaining to mitigators by stating:

*832 When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. See Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). The court must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence.... The court next must weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance. Although the relative weight given each mitigating factor is within the province of the sentencing court, a mitigating factor once found cannot be dismissed as having no weight. To be sustained, the trial court's final decision in the weighing process must be supported by "sufficient competent evidence in the record." Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla.1981).
Id. at 419-420 (footnotes omitted).
The trial court adequately considered the impaired capacity mitigator. Butler's argument to the contrary is belied by the sentencing order itself. The sentencing order explicitly discusses the impaired capacity issue. The judge considered this factor in the discussion of the HAC aggravator. The trial judge stated the defense offered the impaired capacity evidence in the form of Dr. Maher's testimony "to mitigate the State's position that the crime was torturous." The court then pointed out that the defense failed to present testimony at trial that substantiated the claim that Butler was in fact impaired by his use of cocaine and other substances at the time of the murder.[7] For these reasons, the court concluded the crime was heinous, atrocious, and cruel. See Brown v. State, 721 So.2d 274 (Fla.1998) (finding, despite defendant's use of cocaine and alcohol on the night of the murder, that no evidence was presented that he was actually intoxicated at the time of the crime or that his capacity to appreciate the criminality of his act was impaired); Cooper v. State, 492 So.2d 1059 (Fla.1986) (finding consumption of alcohol and marijuana on the day of the murder without more does not compel a finding of the diminished capacity mitigator). Therefore, the trial judge's conclusion that the weight of the HAC aggravator was not diminished by this proposed mitigator was proper.
Butler's use of cocaine and alcohol was also explored by the trial judge during the discussion of the statutory mitigating circumstances of under the influence of extreme mental or emotional disturbance and as a separate nonstatutory mitigating factor of long-term substance abuse. The trial judge followed the Campbell directive in discussing all the mitigating evidence presented.

Proportionality
In deciding whether the death sentence is proportional in a particular case, this Court is required to consider the totality of circumstances surrounding the case and compare it to other capital cases. See Sexton v. State, 775 So.2d 923 (Fla. 2000) (citing Urbin v. State, 714 So.2d 411 (Fla.1998)); Brown v. State, 721 So.2d 274 (Fla.1998). Comparing this case to other *833 capital cases with similar aggravating and mitigating circumstances demonstrates that Butler's sentence of death is proportional.
The trial court found one aggravating circumstance, heinous, atrocious or cruel (HAC), and several mitigating circumstances, including under extreme mental or emotional disturbance. Butler argues the death penalty is not proportional because the murder was committed during an emotional, domestic dispute. This argument is not persuasive or dispositive of the issue. As we held in Pooler v. State, 704 So.2d 1375 (1997), there is no per se "domestic dispute" exception to imposition of the death penalty. Domestic situations are evaluated in the same manner as other cases for determination as to whether a death sentence may be disproportional given the overall circumstances. See, e.g., Spencer v. State, 691 So.2d 1062 (Fla.1997) (death penalty affirmed where the defendant killed his wife and the trial court found HAC and prior felony, as well as a number of statutory and nonstatutory mitigators).
Given the overall circumstances of this case, imposition of a sentence of death is not disproportional. We have upheld the death sentence in several cases where the HAC aggravator has been found along with several mitigating factors. See Spencer v. State, 691 So.2d 1062 (Fla.1997). Moreover, the death penalty has been held to be proportional in several cases where a domestic relationship existed between victim and defendant. See Pooler, 704 So.2d at 1380; Spencer; Cummings-El v. State, 684 So.2d 729 (Fla.1996); Henry v. State, 649 So.2d 1366 (Fla.1994); Porter v. State, 564 So.2d 1060 (Fla.1990).
In Ferrell v. State, 680 So.2d 390 (Fla. 1996), we affirmed a sentence of death where the defendant shot his live-in girlfriend twice in her head. One aggravator, a previous felony conviction for second-degree murder of another woman the defendant had known, was found and given great weight. This Court found the death sentence was proportionate to other cases where death had been imposed on defendants who had prior felony convictions. See Duncan v. State, 619 So.2d 279 (Fla. 1993) (death sentence affirmed where single aggravating factor of prior second-degree murder of fellow inmate was weighed against numerous mitigators). Moreover, in Henry v. State, 649 So.2d 1366, the defendant killed both his wife and her son. He was tried separately for each murder. He was convicted of first-degree murder for his wife's murder and sentenced to death. The trial court found the previous conviction of a felony and HAC aggravators. Defendant's sentence was found to be proportional.
In Cardona v. State, 641 So.2d 361 (Fla. 1994), the trial court found the HAC aggravator and five mitigators. This Court found the death sentence was proportional particularly in light of the length of time the child had suffered. We found the death sentence proportionately warranted although the trial court found that at the time of the murder, Cardona was under the influence of extreme mental or emotional disturbance due to her diminished standard of living and daily cocaine use, which substantially impaired her ability to conform her conduct to the requirements of the law.
Similarly, in this case, Fleming suffered several instances of prior abuse by the defendant, and there was no evidence of extreme mental or emotional disturbance and little evidence of drug use. Moreover, the evidence presented at trial indicates that she also suffered for a long period of time throughout the attack. As the trial judge pointed out in his order, the stab wounds were so numerous that the medical *834 examiner testified she had run out of new words to describe them. In fact, several of the wounds were defensive indicating the victim was alive for a substantial portion of the attack. The number of stab wounds inflicted on this victim shows the type of indifference to human life to which this Court alluded in Guzman v. State, 721 So.2d 1155 (Fla.1998). Butler was also unfazed by the presence of the victim's children in the apartment at the time. The totality of the circumstances in this case, which includes this indifference combined with the brutality of this murder, supports imposition of the death penalty. See Brown v. State, 721 So.2d at 277. We find this sentence proportional.
On rehearing, Butler asserts that Florida's capital sentencing scheme violates the United States Constitution under the holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We recently denied a similar claim in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, ___ U.S. ___, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, ___ U.S. ___, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002). We likewise deny relief in this case.

CONCLUSION
For the reasons stated above, we affirm Butler's conviction for first-degree murder and his sentence of death.
It is so ordered.
WELLS, LEWIS, and QUINCE, JJ., and HARDING, Senior Justice, concur.
WELLS, J., concurs with an opinion.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
PARIENTE, J., concurs in part and dissents in part with an opinion.
SHAW, Senior Justice, concurs as to the conviction and dissents as to the sentence.
WELLS, J., concurring.
I fully concur with the majority's opinions.
I write only to comment upon the "nonunanimous advisory sentence" section of Justice Pariente's concurring and dissenting opinion. Of course, the reason for the nonunanimous jury is that this is what has been mandated by Florida statute since 1972, § 921.141(3), Fla. Stat., and that statute was upheld in 1975 against a constitutional attack based upon the assertion that "a simple majority vote violates the defendant's right to a trial by jury guaranteed by the Florida and United States Constitution." Alvord v. State, 322 So.2d 533, 536 (Fla.1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976). The concurring and dissenting opinion advocates revising Florida law on this specific issue, although it has been applied for twenty-eight years and has been repeatedly upheld by this Courtas recently as 1997. See Whitfield v. State, 706 So.2d 1 (Fla.1997), cert. denied, 525 U.S. 840, 119 S.Ct. 103, 142 L.Ed.2d 82 (1998); Thompson v. State, 648 So.2d 692 (Fla.1994), cert. denied, 515 U.S. 1125, 115 S.Ct. 2283, 132 L.Ed.2d 286 (1995); Brown v. State, 565 So.2d 304 (Fla.1990), cert. denied, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990).
The contention of the concurring and dissenting opinion is based in part on the statute being unconstitutional as to article I, section 22, of the Florida Constitution. However, that provision of Florida's constitution has not changed since this Court's various opinions upholding the capital sentencing statute.
*835 ANSTEAD, C.J., concurring in part and dissenting in part.
While I concur in the affirmance of appellant's conviction, I agree with Justice Pariente that the United State's Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires that appellant's sentence be vacated.
PARIENTE, J., concurring in part and dissenting in part.
I concur in the affirmance of the conviction, but would reverse the death sentence. In my opinion, death is not a proportionate sentence in this case involving a single aggravating circumstance, because Butler's crime is not among the most aggravated and least mitigated of capital murders. See Jones v. State, 705 So.2d 1364, 1366 (Fla.1998); State v. Dixon, 283 So.2d 1, 7 (Fla.1973). In addition, I believe that the jury instruction given in this case created a danger that the jury did not actually find the sole aggravating factor necessary to render Butler eligible for the death sentence. This concern is magnified by the United States Supreme Court decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which Butler cites in his motion for rehearing. Butler's reliance on Ring also presents this Court with an additional question about the constitutionality of the death sentence that I do not believe is adequately addressed in the majority opinion.

I. NONUNANIMOUS ADVISORY SENTENCE
Butler asserts on rehearing that his sentence was unconstitutionally imposed, relying for support on Ring, in which the United States Supreme Court held that any fact necessary to impose a sentence of death must be found by a jury beyond a reasonable doubt. I recognize that this Court has rejected numerous Ring claims raised in postconviction proceedings in cases that involved prior violent felony aggravating circumstances, beginning with Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, ___ U.S. ___, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, ___ U.S. ___, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002). We have also considered and summarily rejected Ring-based claims in direct appeals. See Lugo v. State, 845 So.2d 74, 2003 WL 359291 (Fla. Feb. 20, 2003); Kormondy v. State, 845 So.2d 41, 2003 WL 297027 (Fla. Feb. 13, 2003); Doorbal v. State, 837 So.2d 940 (Fla.2003); Anderson v. State, 841 So.2d 390(Fla. 2003); Israel v. State, 837 So.2d 381 (Fla.2002). I concurred in the results in those cases because of the existence of a prior violent felony conviction aggravator or a unanimous advisory sentence in each instance.
This case is different, however, because it is a direct appeal that does not involve either a prior violent felony aggravator or a unanimous jury advisory sentence. In Butler's penalty phase, the jury recommended a sentence of death by an eleven-to-one vote. The trial court, in its order sentencing Butler to death, found as the sole aggravating circumstance that the homicide was especially heinous, atrocious, or cruel. The fact that this case does not involve a prior-conviction aggravator places squarely before us, in a direct appeal as opposed to the postconviction proceedings in Bottoson and King, the question of the validity of the nonunanimous advisory sentence as a foundation for the death sentence. See Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed *836 statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). This case therefore poses a crucial question as to the constitutional validity of the death sentence, a question that the majority does not satisfactorily answer by pointing out that the Court "denied a similar claim" in Bottoson and King. See majority op. at 834. I believe that our constitutionally and statutorily mandated duty of review in direct death appeals[8] compels us to emerge from behind these distinguishable postconviction decisions and directly address the issue in this case.
In my view, the United States Supreme Court decision in Ring, considered in tandem with the jury-trial guarantee in article I, section 22 of the Florida Constitution, requires that we reverse Butler's death sentence. First, because of an erroneous jury instruction, the jury may not have found the existence of the single aggravating circumstance that rendered Butler eligible for the death penalty, as I believe is required by Ring. Second, the jury's advisory sentence was not unanimous, as I believe is required by article I, section 22, consistent with all other jury findings in criminal cases in this state.
In Ring, the Court held that "[c]apital defendants, no less than non-capital defendants, are entitled under the Sixth Amendment to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 122 S.Ct. at 2432. The Court further held that where "aggravating factors operate as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury." Id. at 2443 (citation and internal quotation marks omitted). Although a majority of the Supreme Court has adhered to the proposition that it is constitutionally permissible for the judge to make the ultimate determination of whether the death sentence should be imposed, the constitutional requirement of Ring is that the jury make the required predicate factual determinations that render the defendant eligible for the death penalty.[9] As recently explained by Justice Scalia:
In Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), we held that aggravating circumstances that make a defendant eligible for the death penalty "operate as `the functional equivalent of an element of a greater offense.'" 122 S.Ct. at 2443 (emphasis added). That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of "murder" is a distinct, lesser included offense of "murder plus one or more aggravating circumstances": Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death.
Sattazahn v. Pennsylvania, 537 U.S. 101, ___, 123 S.Ct. 732, 739, 154 L.Ed.2d 588 (2003) (Scalia, J., joined by Rehnquist, C.J., and Thomas, J.). Moreover, as Justice *837 Scalia stated in his concurring opinion in Ring,
I believe that the fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receiveswhether the statute calls them elements of the offense, sentencing factors, or Mary Janemust be found by the jury beyond a reasonable doubt.
. . . .
... [W]hether or not the States have been erroneously coerced into the adoption of "aggravating factors," wherever those factors exist they must be subject to the usual requirements of the common law, and to the requirement enshrined in our Constitution, in criminal cases: they must found by the jury beyond a reasonable doubt.
122 S.Ct. at 2444-45 (Scalia, J., concurring). Justice Scalia acknowledged in Ring that the Court's holding magnifies the burdens imposed on the states under Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), by creating an evidentiary standard for aggravating circumstances "that a unanimous jury must find beyond a reasonable doubt." 122 S.Ct. at 2444 (emphasis supplied).
Under Florida's sentencing scheme, however, the jury's role is not to make binding determinations of fact as to the existence of aggravating circumstances that qualify the defendant for the ultimate punishment of death. The jury merely makes a sentencing recommendation based on a determination that at least one aggravating circumstance exists and that the aggravating circumstance(s) outweigh(s) any mitigating circumstance. In this case, we cannot be certain that the recommendation reflects a finding of the existence of the single aggravating circumstance submitted to the jury. The trial court instructed the jury to consider the single aggravating circumstance "that is established by the evidence" rather than "if it is established by the evidence." See majority op. at 831. Because of the trial judge's misstatement, it cannot now be determined whether the jury found that the HAC aggravator existed, as required for a death recommendation, or whether its advisory sentence reflects a mistaken perception that the judge had already found the existence of the aggravator.[10]
Alsoand this is a crucial concern hereunder Florida's sentencing scheme the jury's advisory sentence of death need not be unanimous; a bare majority will suffice. Because of its place in Florida's common law, the consistency of its application in the criminal law of our state, and its codification in our rules of procedure, I agree with Justice Shaw's observation in Bottoson that the "requirement of unanimity has been an inviolate tenet of Florida jurisprudence since the State was created." 833 So.2d at 714 (Shaw, J., concurring in result only) (emphasis supplied). Apart from capital sentencing, the requirement of unanimity has been scrupulously honored in the criminal law of this state for any finding of guilt and for any fact that increases the maximum punishment. Unanimity of verdicts has always been part of Florida's common law. See Motion to call Circuit Judge to Bench, 8 Fla. 459, 482 (1859) ("The common law wisely requires the verdict of a petit jury to be unanimous."); see also Jones v. State, 92 So.2d 261, 261 (Fla.1956) ("In this state, the verdict of the jury must be unanimous."); Grant v. State, 33 Fla. 291, 14 So. *838 757, 758 (1894) (stating that procedure in returning verdicts requires jury to have come to unanimous agreement with respect to its verdict). A unanimous jury finding is also required in order to increase the authorized punishment for the use of a weapon or firearm during a felony under section 775.087(1), Florida Statutes (2002).[11] Statutes governing several substantive crimes also raise the maximum potential sentence based on guilt-phase, unanimous jury findings of aggravating circumstances. See §§ 794.011, (sexual battery); 810.02 (burglary), 810.08 (trespass), 812.13 (robbery), Fla. Stat. (2002). The requirement of jury unanimity is also written into our rules of procedure. See Fla. R.Crim. P. 3.440 ("No verdict may be rendered unless all of the trial jurors concur in it.")
Florida's exclusion of the death penalty from the requirement of jury unanimity cannot be reconciled with the United States Supreme Court's recognition in Ring that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death," and its holding that "the Sixth Amendment applies to both." 122 S.Ct. at 2443 (emphasis supplied). The right to trial by jury in Florida would be senselessly diminished if the jury is required to return a unanimous verdict on every fact necessary to render a defendant eligible for a penalty with the exception of the final and irrevocable sanction of death.
The absence of a requirement of a unanimous jury finding as a precondition to a sentence of death is, in my view, a matter of constitutional significance. Article I, section 22 of our constitution provides: "The right of trial by jury shall be secure to all and remain inviolate." Justice Shaw observed in Bottoson that the principle that the right to trial by jury shall "remain inviolate" has been enshrined in every Florida Constitution since 1838. 833 So.2d at 714 (Shaw, J., concurring in result only).
In Traylor v. State, 596 So.2d 957 (Fla. 1992), this Court stated:
[W]hen called upon to construe their bills of rights, state courts should focus primarily on factors that inhere in their own unique state experience, such as the express language of the constitutional provision, its formative history, both preexisting and developing state law, evolving customs, traditions and attitudes within the state, the state's own general history, and finally any external influences that may have shaped state law.
Id. at 962. Applying the criteria in Traylor to article I, section 22 in light of the holding in Ring leads me to conclude that the state constitutional right to trial by jury requires a unanimous jury finding beyond a reasonable doubt on the existence of any element necessary to increase an authorized punishment, most especially the ultimate punishment of the death penalty. Simply put, the requirement of jury unanimity for proving every other element of a criminal offense in Florida, except for the critical element required in order to impose the death penalty, is not constitutionally justified in light of Ring.
The justification for the reexamination of our precedent leading to this conclusion *839 comes in part from the fact that in Ring, the United States Supreme Court receded from its own precedent when it declared Arizona's death penalty statute unconstitutional under the Sixth Amendment, twelve years after it had upheld the same statute against a Sixth Amendment challenge in Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). It is the Ring decision, and, in the words of Justice Scalia, the acquiring of "new wisdom" that it represents, 122 S.Ct. at 2443, that creates serious implications for Florida's death penalty scheme and calls on us to reexamine our own precedent interpreting our state constitution. Only the United States Supreme Court can overrule its own precedent, but this Court is obligated, when prompted by issues raised in a case pending review, to examine the effect of Supreme Court pronouncements on its own jurisprudence. See Brown v. State, 719 So.2d 882, 889 (Fla.1998) (receding from 16-year-old decision in holding that the State and the trial court should accept the stipulation of a prior conviction in a prosecution for possession of a firearm by a convicted felon, based on a recent United States Supreme Court decision).
I acknowledge that beginning in 1975, this Court has upheld Florida's death penalty statute against constitutional claims based on the lack of a unanimous advisory sentence. See Alvord v. State, 322 So.2d 533, 536 (Fla.1975). Alvord relied in part on Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), in which the United States Supreme Court upheld a state conviction resting on a nine-to-three guilty verdict, concluding that "jury unanimity" for a conviction has never been a "requisite of due process of law" that the states are obligated to follow. Id. at 359, 92 S.Ct. 1620. However, this Court never analyzed the fact that in this state, jury findings of unanimity have always been required on issues that relate to guilt or to increases in the maximum punishment. Frankly, prior to Apprendi and Ring, there would have been no reason to re-examine our precedent in this area.
Further, in rejecting the constitutional challenge to a nonunanimous advisory sentence in Alvord, this Court relied on Watson v. State, 190 So.2d 161 (Fla.1966), which construed a predecessor to section 921.141, Florida Statutes (2002), that required imposition of a death sentence for first-degree murder unless the jury then recommended mercy. This Court reasoned in Watson that requiring a unanimous vote for a jury recommendation would reduce a defendant's chances of mercy. 190 So.2d at 166. Alvord does not discuss the distinction between the statute construed in Watsonwhich was subsequently invalidated by Furman v. Georgiaand section 921.141, which expanded the jury's role by giving it an affirmative voice in imposing death.
In my view, we are obligated to reevaluate the legal reasoning of Alvord and our subsequent adherence to it in the light of Ring's implications for nonunanimous advisory verdicts under our state constitution. In State v. Gray, 654 So.2d 552, 554 (Fla. 1995), this Court receded from precedent of eleven years' vintage in concluding that "the legal fictions required to support the intent for [attempted] felony murder are simply too great." The Court stated:
In reaching this decision, we are mindful of the importance of the doctrine of stare decisis. Stare decisis provides stability to the law and to the society governed by that law. State v. Schopp, 653 So.2d 1016 (Fla.1995) (Harding, J., dissenting). Yet stare decisis does not command blind allegiance to precedent. "Perpetrating [sic] an error in legal thinking under the guise of stare decisis serves no one well and only undermines *840 the integrity and credibility of the court." Smith v. Department of Ins., 507 So.2d 1080, 1096 (Fla.1987) (Ehrlich, J., concurring in part, dissenting in part).
Id. These observations resonate deeply in this area of the law, where we have relied on United States Supreme Court precedent which that Court receded from in Ring. See, e.g., Mills v. Moore, 786 So.2d 532, 537 (Fla.2001) (holding, in a decision issued before Ring, that "[b]ecause Apprendi did not overrule Walton, the basic scheme in Florida is not overruled either").
As the United States Supreme Court explained in Ring, "although `the doctrine of stare decisis is of fundamental importance to the rule of law,' ... [the Court's] precedents are not sacrosanct." 122 S.Ct. at 2442-433. In a direct appeal of a judgment and sentence imposing the ultimate punishment of death, based on a nonunanimous jury recommendation and a single aggravating factor not involving prior convictions, this Court should reexamine the effect of the United States Supreme Court decision in Ring on our own precedent. Cf. Smith v. State, 598 So.2d 1063, 1066 (Fla.1992) ("[A]ny decision of this Court announcing a new rule of law, or merely applying an established rule of law to a new or different factual situation, must be given retrospective application by the courts of this state in every case pending on direct review or not yet final."). The issue of the application of Ring to cases that are already final (i.e., in the postconviction stage) is not before us today, and therefore I would not address the extension of a unanimity requirement to such cases. See Witt v. State, 387 So.2d 922 (Fla.1980) (setting standards for retroactive application of decisions of United States Supreme Court or Florida Supreme Court announcing new rule of law to cases already final). Butler's motion for rehearing presents us with the opportunity, and I believe the obligation, to address the issues discussed herein in a direct appeal.
Accordingly, I would reverse Butler's death sentence under the narrow circumstances presented by the facts of this case, and remand for a new penalty phase.[12] In the alternative, I would reduce Butler's sentence to life imprisonment without parole based on a proportionality analysis as explained below.

II. PROPORTIONALITY
Independent of the effect of Ring, I believe that pursuant to a proportionality analysis, the sentence in this single-aggravator case should be reduced to life. Although the trial court found no statutory mitigation in this case, there is evidence that Butler was drinking alcohol and using cocaine on the night of the murder. Dr. Michael Maher explained that irrational, repetitive actions are a common effect caused by the use of cocaine. He opined that the number of stab wounds in this casewhich the trial court used to support the HAC aggravatoris consistent with this effect. Further, regarding the violent death of Butler's mother when Butler was only eight, Dr. Maher explained that a child whose mother dies as a result of violence faces a greater risk of participating in violence to resolve conflicts, especially when combined with drug use.
With the exception of Cardona v. State, 641 So.2d 361 (Fla.1994),[13] the trial court *841 found additional aggravators other than HAC in the cases affirming death sentences cited by the majority. See Pooler v. State, 704 So.2d 1375, 1377 (Fla.1997) (HAC, prior violent conviction, committed during burglary); Cummings-El v. State, 684 So.2d 729, 731 (Fla.1996) (HAC, CCP, prior violent felony, committed during burglary); Henry v. State, 649 So.2d 1366, 1367 (Fla.1994) (HAC and prior violent felony); Porter v. State, 564 So.2d 1060, 1063 (Fla.1990) (reversing the finding of HAC but affirming the finding of CCP and stating, "[t]his is not a case involving a sudden fit of rage").
Moreover, it appears that the majority opinion relies on impermissible nonstatutory aggravation to support its finding that the death sentence is proportionate. Specifically, the majority states:

Butler was also unfazed by the presence of the victim's children in the apartment at the time. The totality of the circumstances in this case, which includes this indifference combined with the brutality of the murder, supports imposition of the death penalty.
Majority op. at 834 (emphasis supplied). The fact that the murder occurred in the presence of the victim's children does not support any specific statutory aggravator in this case. Thus, to the extent that the majority has improperly considered inadmissible nonstatutory aggravation, its proportionality analysis is flawed.
In my view, Butler's crime is not among the "most aggravated and unmitigated of [the] most serious crimes" for which the death penalty is reserved. State v. Dixon, 283 So.2d at 7. See also Jones v. State, 705 So.2d at 1366 (reversing death sentence on proportionality grounds in case with one aggravating factor and "copious unrebutted mitigation"). Therefore, I would reverse the death sentence and remand for imposition of a sentence of life imprisonment.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] § 90.403, Fla.Stat. (1997).
[3] See § 90.404(2)(a), Fla.Stat. (1997).
[4] Tennell later explained during direct examination that he ran away when Butler told him to and that he was carrying cocaine with him that morning.
[5] In its 1992 publication, the National Research Council (NRC) explicitly withheld endorsement of the PCR method of DNA testing. See Murray, 692 So.2d at 160 (relying on National Research Council, DNA Technology in Forensic Science 70 (1992)).
[6] In United States v. Chischilly, 30 F.3d 1144 (9th Cir.1994), the United States Court of Appeals for the Ninth Circuit provides an understandable explanation of the intricacies of DNA tests and analyses.

Forensic DNA tests compare allele combinations at loci where the alleles tend to be highly variable across individuals and ethnic groups. If there is no match between the alleles from the evidence DNA and the potential suspect's DNA, the suspect is generally ruled out as the source of the evidence, unless the failure is attributable to inadequate test conditions or contaminated samples. If there is a match, analysts use the frequency of the alleles' appearance in the relevant population to calculate the probability that another person could have the same pattern of allele pairs.
Id. at 1152 n. 7 (relying on Georgia Sargeant, DNA Evidence Finding Stricter Scrutiny, New Uses, Trial, Apr. 1993, at 15). In United States v. Bonds, 12 F.3d 540 (6th Cir.1993), the United States Court of Appeals for the Sixth Circuit illustrates the product rule:
To estimate the frequency of a suspect's overall DNA pattern, the individual allele frequencies are multiplied together, using a multiplication or product rule, to compute an aggregate estimate of the probability that this combination of alleles in the suspect's DNA sample would be encountered in a particular racial population.
Id. at 550.
[7] Although Dennis Tennell discussed Butler's use of beer and cocaine on the night of the murder and Antonio Strappy indicated Butler appeared as if he had been using drugs, neither said Butler was in any way incapacitated that night.
[8] See Art. V, § 3(b)(1), Fla. Const.; § 921.141(4), Fla. Stat. (2002)
[9] The Court in Ring identified Florida was one of four states that utilized hybrid death schemes in which both the judge and the jury play an active role in death sentencing. See 122 S.Ct. at 2442 n. 6. The other states are Delaware, Indiana, and Alabama. Delaware changed its sentencing statute shortly after the Ring decision to prohibit a death sentence in the absence of a unanimous jury finding beyond a reasonable doubt of the existence of at least one aggravating circumstance. See 73 Del. Laws 423 (2002) (amending Del.Code Ann. tit.11, § 4209). Indiana amended its death penalty law after Ring to eliminate jury overrides. See 2002 Ind. Acts 117, § 2 (amending Ind.Code § 35-50-2-9 (2002)).
[10] In addition, the fact that the jury was told that its role is advisory presents additional concerns in light of Ring, as more fully discussed in Justice Lewis's separate concurrence in Bottoson. See 833 So.2d at 731-34 (Lewis, J., concurring in result only).
[11] See State v. Tripp, 642 So.2d 728, 730 (Fla.1994) ("This special verdict formnot allegations in an informationindicates when a jury finds a weapon has been used."); State v. Overfelt, 457 So.2d 1385, 1387 (Fla.1984) ("The question of whether an accused actually possessed a firearm while committing a felony is a factual matter properly decided by a jury.").
[12] As discussed in my concurring-in-result-only opinion in Bottoson, I believe that special verdict forms reflecting unanimous jury findings on aggravating circumstances should be used "to ensure that future verdicts comply with our state constitutional requirements ... as well as the Sixth Amendment dictates of Ring." See 833 So.2d at 723-25.
[13] In Cardona, the facts underlying HAC revealed an eighteen-month history of "torturous" child abuse culminating in the three-year-old victim's death, 641 So.2d at 365, which I do not find paralleled by the prior incidents of abuse against the adult victim in this case.